2018 UT App 79

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OZWALD BALFOUR,
Appellant.

Opinion
No. 20141119-CA
Filed April 26, 2018

Third District Court, Salt Lake Department
The Honorable Robin W. Reese
No. 111905240

Ronald Fujino and Marshall Thompson, Attorneys
for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1　　Appellant Ozwald Balfour (Defendant) was convicted of
the forcible sodomy of a minor.[1] He seeks a new trial, arguing
that he was denied the effective assistance of counsel, that the
trial court improperly admitted evidence of other bad acts

---

1. Defendant has previously been before this court. In 2005, the
State charged Defendant with three counts of forcible sexual
abuse and one count of attempted forcible sexual abuse. That
prosecution reached this court on interlocutory review in *State v.
Balfour*, 2008 UT App 410, 198 P.3d 471.

against him, and that the court violated his constitutional due process rights at trial by excluding his witnesses. We affirm.

## BACKGROUND

### *The Victim*

¶2    In early 2005, a seventeen-year-old girl (Victim) was making her way to a bus stop when Defendant approached her and exclaimed, "You're perfect." After explaining that he represented a talent agency, he asked whether she might be interested in a modeling career. Victim was thrilled by the prospect. Upon Defendant's request, she immediately agreed to enter his car and accompany him to his office.

¶3    Once they arrived, Defendant sat her down and informed her that there are "things that models . . . and famous people have to do to get where they are today." For instance, he told her that she would need to have her picture taken, "with and without clothing." When Victim expressed concern that her parents might not approve, he urged her not to worry, saying he would smooth things over with them. He then asked her to return to his office in two days for her first photo shoot.

¶4    When Victim returned two days later, Defendant introduced her to a photographer, who proceeded to take "some face poses." But after a short time, the photographer finished shooting, packed up, and left Victim alone with Defendant. Defendant then informed Victim that "he needed to take his own pictures" of her. Growing "nervous," she told Defendant that she needed to leave. Defendant insisted that she stay, telling her that "it was okay" and that there were "things" that aspiring models "need to do to get to the places they want to get to." He then "pulled out some pictures of a young girl" who he claimed had made it as a model with his help, and who he said was now "in Paris." Victim acquiesced.

¶5      Defendant then laid out a beach towel, turned on music, and retrieved some baby oil. Although he had wanted her "all the way undressed," Victim refused to remove her bra and underwear. Defendant began rubbing the oil on Victim's legs, beginning near her ankles but inching gradually toward her pelvis. Feeling "nervous and disgusted," Victim again stated that she wished to leave, but Defendant "kept rubbing and . . . telling [her] that it's going to be okay." After moving his hands "closer and closer" to Victim's genitals, he suddenly "pulled back [her] underwear" and placed his tongue on her vagina.

¶6      Victim immediately "jumped up," "pushed [Defendant] off" of her, and demanded that she be allowed to leave. Defendant attempted to calm her, reiterating that "there's things you got to do" to make it as a model, but Victim remained firm. Seeing that she would go no further, he relented, and Victim headed for the door. As she did, Defendant told her that there was no "need to talk to anybody" about their meeting or to "tell anyone" what he had done.

*Defendant's Other Bad Acts*

¶7      Lamentably, Victim's is not the only traumatic story relevant to the proceedings below. Three other women also appeared at Defendant's trial, and each testified that, between late January and early February of 2005, Defendant subjected her to some form of abuse. Because Defendant challenges the propriety of the trial court's decision to allow testimony from these three witnesses, we must explain the substance of their testimony in some detail.

¶8      R.G. was nineteen years old when Defendant stopped her in a grocery store aisle and began asking her questions about herself. She had observed Defendant "just kind of wandering" the aisles, noting that he carried neither a grocery basket nor any items from the store shelves. Then, turning a corner, she found that he was facing her "head on." Defendant began peppering her with questions about her private life, such as whether she was in school and what activities she enjoyed. Upon learning she

was involved in a youth-mentoring program, Defendant informed her that he was scouting talent for a "kids program that was on TV" and asked whether she would be interested in working with him. Excited at the thought of being on television, R.G. answered that she would be interested, whereupon Defendant insisted that they proceed directly to his office.

¶9     Upon arriving at Defendant's office, his receptionist handed R.G. an application form, and as she sat down to complete it, she observed "some posters on the wall of movies." Soon after she had sat down to fill out her form, Defendant interrupted her and asked that she join him in his office. Immediately after closing the door, Defendant began making "inappropriate, strange comments," and he asked R.G. to take off her jacket. When she refused, he grabbed onto her hips, pulled her close to him, and then lifted up her top to expose her bra. R.G. left right away, "in shock."

¶10     On another occasion, Defendant invited R.O. and M.L. to his office for an interview. When they arrived, Defendant began by asking R.O. to follow him into a back room of the office. Once they were alone, Defendant asked R.O. to show him "how [she] would act in a love scene." When she refused and stated she was "happily married," Defendant "grabbed [her] breasts." R.O. quickly pushed him away and, after struggling with the door for a moment, was able to leave the room.

¶11     M.L. witnessed R.O. emerge from the back room and head "right out the door" without saying a word. Defendant appeared a few moments later and asked M.L. to follow him back into the room. Once the door was shut, and apparently locked, Defendant turned to M.L. and, without "say[ing] anything," began "lifting [her] shirt and grabbing [her] breasts." He told her that she "had two minutes to take him" or "prove to him," and, taking hold of M.L.'s arm, he "put [her hand] on his crotch." Screaming at Defendant to "knock it off," M.L. then twisted away from Defendant and began "banging on the door."

At that point, Defendant opened the door and allowed her to leave.

*The Proceedings Below*

¶12   R.G., R.O., and M.L. immediately reported their encounters with Defendant to the police and, within months, the State charged Defendant with multiple counts of forcible sexual abuse. Victim, however, did not report Defendant's conduct until nearly two years later, in 2007. The prosecutor then lost contact with her, apparently because she changed residences several times. Finally, in 2010, a detective managed to locate Victim, and a few months later, the State charged Defendant with forcible sodomy.[2] In the meantime, the prosecution against Defendant for his conduct toward R.G., R.O., and M.L. ended in a plea bargain, with Defendant pleading no contest to three counts of sexual battery. He was placed on probation.

¶13   Soon after the State filed its forcible sodomy charge concerning Victim, the trial court appointed an attorney (Attorney A) to serve as defense counsel. Upon his appointment, Attorney A moved to dismiss the charge against Victim because of the prosecutor's alleged breach of Defendant's plea agreement in the earlier case. The State, he argued, had agreed not to bring the instant charge in exchange for Defendant's no-contest pleas

---

2. No statute of limitations currently applies to the crime of forcible sodomy. Utah Code Ann. § 76-1-301(2)(l) (LexisNexis 2017). While prior to 2008 the crime had been subject to a limitations statute, *see id.* § 76-1-302(2)(c) (Supp. 2005), the Legislature abrogated that statute before the limitations period expired on this prosecution. Therefore, the current rule applies. *See State v. Lusk*, 2001 UT 102, ¶ 26, 37 P.3d 1103 ("[A] statutory amendment enlarging a statute of limitations will extend the limitations period applicable to a crime already committed . . . if the amendment becomes effective before the previously applicable statute of limitations has run[.]").

in the previous prosecution. The court denied the motion, observing that no such arrangement was mentioned in either the written plea agreement or the plea colloquy transcript. Defendant refused to accept the court's decision, and he and Attorney A reached an impasse over whether to file an interlocutory appeal of the order. Their disagreement appears to have been the catalyst for Attorney A's withdrawal as defense counsel.

¶14 Upon Attorney A's departure, another attorney (Attorney B) entered an appearance as counsel for Defendant. At his first hearing, the trial court directed Attorney B to consider a motion Attorney A had filed just before withdrawing and decide whether it could be "renew[ed]" and argued in "good faith." The motion, which Attorney A had not briefed, accused the State of violating Defendant's due process rights by maliciously delaying the institution of its forcible sodomy charge to gain a tactical advantage in the case. Attorney B did not file a memorandum in support of the motion prior to the court's next scheduled hearing, nor did he attempt to defend it at oral argument. Instead, he devoted his time at the hearing to opposing the State's notice of its intent to introduce rule 404(b) evidence at trial.[3] Accordingly, the court did not address the merits of the unbriefed motion.

¶15 Meanwhile, tensions once again began to rise between Defendant and his counsel. Citing his frustration with Attorney B's refusal to file the motions or advance the legal arguments he thought were best, Defendant began filing his own motions with

---

3. Rule 404(b) of the Utah Rules of Evidence permits "[e]vidence of a crime, wrong, or other act" to be admitted in limited circumstances. Utah R. Evid. 404(b)(1)–(2). The rule specifies that, "[o]n request by a defendant in a criminal case, the prosecutor must . . . provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial." *Id.* R. 404(b)(2)(A).

the court. At a hearing following one such motion—which asserted, among other things, "Prosecutorial Malfeasants"—the court cautioned Defendant that it would not consider any pro se motions filed while he was represented by counsel, and it asked whether Defendant wished to represent himself instead. Defendant responded that he did not.

¶16    But Defendant continued to clash with Attorney B over how to proceed with his defense. Attorney B eventually withdrew, as did his replacement, Attorney C, after a "shouting match" in which Defendant demanded that Attorney C "do [his] damn job." Attorney D entered an appearance following Attorney C's withdrawal, but she likewise found Defendant too difficult to work with. When Defendant petitioned the court to remove her, Attorney D explained that Defendant had pressured her to file several frivolous motions, including a motion to recuse the judge, and to mount a "full-scale media campaign" against the Salt Lake County District Attorney. Attorney D opined that, given his temperament, "probably no one can work with [Defendant]."

¶17    Following Attorney D's withdrawal, Defendant resolved to represent himself for the remainder of the case, with the assistance of standby counsel. Attorney E appeared on Defendant's behalf and informed the court of Defendant's decision. After Defendant acknowledged to the court that he understood the dangers inherent in self-representation, the court granted his request, and it further permitted Attorney E to remain on the case as standby counsel. Defendant then reaffirmed his desire to represent himself on several subsequent occasions, saying, for instance, that it would be "totally unacceptable" for Attorney E to take control of the case, and later introducing himself to the jury as "lead counsel." Before trial, Defendant filed a motion to dismiss that contained several grounds for dismissal, and he also made an oral motion to dismiss for lack of jurisdiction. Significantly, he did not raise the malicious-delay-of-prosecution argument Attorney B had abandoned earlier in the case.

¶18    Defendant's case proceeded to trial. Defendant having been given an opportunity to oppose the use of rule 404(b) evidence at an earlier hearing, the State successfully secured admission of the testimony of R.G., R.O., and M.L. during its case-in-chief. When the State rested, Defendant sought to put on his own witnesses. Although he had provided the prosecutor with a witness list—which included, among others, a judge, the Salt Lake County District Attorney, and the Utah Attorney General—Defendant had failed to provide a summary of his witnesses' proposed testimony or an explanation of why their testimony was relevant. Because Defendant's omissions were in contravention of two separate court orders, the court excluded the witnesses as a discovery sanction.

¶19    At trial, the jury found Defendant guilty of forcible sodomy, a first-degree felony. The court imposed a suspended prison sentence of five years to life and ordered a term of probation, pursuant to which Defendant would be required to serve one year in jail and complete 150 hours of community service.[4] Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶20    Defendant raises three issues on appeal.[5] First, he argues that his second attorney—Attorney B—deprived him of his right

---

4. His probation was later revoked, and Defendant began serving his prison sentence. His appeal from the revocation of his probation is the subject of a separate appeal pending in this court, *State v. Balfour*, case no. 20160821-CA.

5. Three other issues are identified, in a single sentence each, at the end of Defendant's brief. The brief recites that the issues are included at the request of Defendant, and on the authority of *Anders v. California*, 386 U.S. 738 (1967), and *State v. Clayton*, 639 P.2d 168 (Utah 1981). Those cases govern the procedure to be followed when appellate counsel sees no meritorious issue for

(continued…)

to the effective assistance of counsel. When an ineffective assistance of counsel claim is first raised on appeal, "there is no lower court ruling to review and we must determine whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Tirado*, 2017 UT App 31, ¶ 10, 392 P.3d 926.

¶21 Second, Defendant argues that the trial court erred in admitting the testimony of R.G., R.O., and M.L. "Appellate courts review a trial court's decision to admit character evidence and prior bad acts under an abuse of discretion standard." *State v. Vu*, 2017 UT App 179, ¶ 9, 405 P.3d 879 (citation and internal quotation marks omitted).

¶22 Finally, Defendant argues that the court deprived him of his constitutional right to due process by excluding the testimony of his proposed witnesses at trial, thus effectively precluding him from presenting a "meaningful defense." Our Supreme Court has recently stated that such issues present an appellate court with a mixed question of fact and law. *Cf. State v. Mohamud*, 2017 UT 23, ¶ 10, 395 P.3d 133 (addressing a defendant's claim that loss of potentially exculpatory evidence deprived him of due process). "We review the legal question involved—whether due process was violated—for correctness. But the underlying factual determinations on which this legal question is based will not be set aside unless clearly erroneous." *Id.* (citations and internal quotation marks omitted). The trial court's factual determinations led it to conclude that discovery sanctions were appropriate, and we review sanctions decisions for abuse of discretion. *See State v. Tiliaia*, 2006 UT App 474, ¶ 7, 153 P.3d 757.

_____

(…continued)

appeal and seeks to withdraw. *See Clayton*, 639 P.2d at 169–70. This is not such a case, and accordingly we do not consider these unbriefed issues.

ANALYSIS

I. Ineffective Assistance of Counsel

¶23   Defendant argues that Attorney B deprived him of his constitutional right to the effective assistance of counsel by "fail[ing] to . . . investigate, brief, or argue" a motion that Attorney A had filed prior to his withdrawal. In this motion, Defendant contended that the State maliciously "delayed prosecution" of the forcible sodomy charge in the present case, violating his due process rights, and should have brought this charge in its first prosecution against him. He insists that the State made its decision "to gain a strategic advantage." Defendant concedes that this issue is unpreserved.

¶24   Ordinarily, "to preserve an issue for appeal, the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *State v. Soules*, 2012 UT App 238, ¶ 9, 286 P.3d 25 (citation and internal quotation marks omitted). There are several exceptions to this general rule, including claims of ineffective assistance of counsel first raised by criminal defendants on appeal. *State v. Allgood*, 2017 UT App 92, ¶ 19, 400 P.3d 1088. This exception is warranted because it would be unreasonable to expect trial counsel to bring his or her own ineffectiveness to the attention of the trial court. We conclude, however, that the exception does not apply to the circumstances presented here.

¶25   After Defendant elected to represent himself, he had the opportunity to assert the due process argument that Attorney B had abandoned, but he failed to do so. Indeed, acting pro se, Defendant filed his own motion to dismiss but declined to include the due process argument among the various grounds for dismissal. Because nothing prevented Defendant from asserting this argument when he represented himself, he may

not now complain about Attorney B's failure to pursue it.[6] *See People v. Polk*, 118 Cal. Rptr. 3d 876, 884–87 (Ct. App. 2010) (holding that a defendant could not assert an ineffective assistance of counsel claim for counsel's failure to make a *Miranda* objection at the defendant's first trial where she represented herself at her second trial and similarly failed to make the objection). *Cf. Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"). For these reasons, we hold that under the unique circumstances of this case, Defendant may not avoid the preservation rule by asserting his argument under the rubric of an ineffective assistance claim. We therefore reject his claim without reaching its merits.

## II. Evidence of Prior Bad Acts

¶26    Defendant argues that the trial court erred in admitting the testimony of R.G., R.O., and M.L. under rule 404(b) of the Utah Rules of Evidence. We conclude that the court acted within the scope of its sound discretion.

¶27    Rule 404(b) of the Utah Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to

---

6. Defendant's pro se status does not exempt him from the duty to raise his arguments with the trial court before asserting them on appeal. "[E]ven though this court . . . is 'understandably loath to sanction [pro se litigants] for a procedural misstep here or there,' we cannot . . . ignore the requirements necessary to preserve an issue for appeal." *Tolle v. Fenley*, 2006 UT App 78, ¶ 70, 132 P.3d 63 (quoting *Lundahl v. Quinn*, 2003 UT 11, ¶ 4, 67 P.3d 1000). "Rather, 'as a general rule, a party who represents himself will be held to the same standard of knowledge and practice as any qualified member of the bar.'" *Id.* (quoting *Lundahl*, 2003 UT 11, ¶ 3).

prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, it further provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, [or] intent." *Id.* R. 404(b)(2). Indeed, we have said that rule 404(b) is fundamentally "an inclusionary rule," *State v. Kooyman*, 2005 UT App 222, ¶ 26, 112 P.3d 1252 (citation and internal quotation marks omitted), and evidence of prior bad acts "is only excluded where the *sole* reason it is being offered is to prove bad character or to show that a person acted in conformity with that character," *State v. Nielsen*, 2012 UT App 2, ¶ 11, 271 P.3d 817 (emphasis in original) (citation and internal quotation marks omitted).

¶28 The Utah Supreme Court has held that bad acts evidence is admissible if three requirements are met. "[T]he trial court must first determine whether the bad acts evidence is being offered for a proper, noncharacter purpose[.]" *State v. Nelson-Waggoner*, 2000 UT 59, ¶ 18, 6 P.3d 1120. "Second, the court must determine whether the bad acts evidence meets the requirements of rule 402, which permits admission of only relevant evidence." *Id.* ¶ 19. "Finally, the trial court must determine whether the bad acts evidence meets the requirements of rule 403[.]" *Id.* ¶ 20.

¶29 Defendant argues that the court erred in its consideration of the first and third of these requirements when it admitted the testimony of R.G., R.O., and M.L.[7] Beginning with the first

---

7. Defendant also argues that this testimony was irrelevant. *See* Utah R. Evid. 401(a) ("Evidence is relevant if . . . it has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence[.]"). In support of this claim, Defendant argues that the court "found that the prior bad acts evidence was relevant for many issues that were not material to the crime charged." Whether or not this is true, we agree with the trial court that the

(continued…)

requirement, Defendant maintains that "[t]he testimony of the women . . . did not serve a legitimate noncharacter purpose." We disagree.

¶30     During his opening statement at trial, Defendant took the position that the evidence would show that Victim fabricated her story about Defendant luring her into his office and sexually abusing her. It was the prosecution's need to rebut this defense that the trial court found to be the "most persuasive reason" for admitting the testimony of the other women. We, too, are persuaded that this was a proper purpose for admitting the evidence.

¶31     Rebutting a fabrication defense does not appear in the list of permissible noncharacter purposes set out in rule 404(b). But as we have said before, that list "is not exhaustive." *State v. Pullman*, 2013 UT App 168, ¶ 31, 306 P.3d 827. In any event, our Supreme Court has expressly stated that under certain circumstances, "prior bad acts can properly be used to rebut a charge of fabrication." *State v. Verde*, 2012 UT 60, ¶ 47, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Adopting the reasoning offered by Justice Arabian on the California Supreme Court, our high court explained that

> "[w]hen one person claims rape, the unusual and abnormal element of lying by the complaining witness may be present. But when two (or more) persons tell similar stories, the chances are reduced that both are lying or that one is telling the truth and the other is coincidentally telling a similar false story."

---

(…continued)
evidence was at least relevant to Defendant's defense that Victim fabricated her story.

*Id.* ¶ 48 (en banc) (Arabian, J., concurring) (quoting *People v. Balcom*, 867 P.2d 777, 787 (Cal. 1994)). Such was the trial court's reasoning here. Taken alone, Victim's testimony might have been vulnerable to a charge of fabrication. As "unusual and abnormal" as it might be that Victim would falsely accuse Defendant of sexual abuse, it strains credulity to suggest that three other women would similarly accuse Defendant falsely. The trial court therefore properly permitted the State to offer bad acts evidence for the purpose of rebutting Defendant's fabrication defense.[8]

---

8. The Utah Supreme Court has referred to this line of reasoning as the "doctrine of chances." *See State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Furthermore, it has held that rule 404(b) evidence should not be admitted under the doctrine of chances "absent satisfaction of four foundational requirements." *Id.* ¶ 57. First, "[t]he issue for which the uncharged misconduct evidence is offered must be in bona fide dispute." *Id.* (emphasis, citation, and internal quotation marks omitted). Second, "[e]ach uncharged incident must be roughly similar to the charged crime." *Id.* ¶ 58 (emphasis, citation, and internal quotation marks omitted). Third, "[w]here the prior uncharged conduct is an accusation of sexual conduct, each accusation must be independent of the others." *Id.* ¶ 60. And fourth, "[t]he defendant must have been accused of the crime . . . more frequently than the typical person [is accused of that crime] accidentally." *Id.* ¶ 61 (emphasis, citation, and internal quotation marks omitted).

　　Given Defendant's truncated briefing on this topic, we need not engage in a detailed analysis to determine whether these foundational requirements were satisfied here. To the extent Defendant addresses them at all, his arguments are misplaced because he erroneously assumes that the purpose for which the trial court admitted the State's bad acts evidence was to show that Victim did not consent to Defendant's conduct. For

(continued…)

¶32 Next, Defendant maintains that the court erred in admitting the testimony under rule 403 because the "[t]he sheer volume of the testimony was . . . problematic" and "the danger of unfair prejudice was acutely high" given the "salacious" nature of their accounts. Rule 403 of the Utah Rules of Evidence provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice" or if it is "needlessly . . . cumulative." Utah R. Evid. 403. We conclude that, while admitting evidence of past sexual activity can be problematic, *see id.* R. 404(b); *see also State v. Balfour*, 2008 UT App 410, ¶¶ 22–26, 198 P.3d 471 (stating that such evidence may be admitted so long as it complies with rules 403 and 404(b) of the Utah Rules of Evidence), in this instance the fact that all four of Defendant's victims told strikingly similar stories renders the probative value of the three witnesses' testimony extremely strong relative to the dangers of unfair prejudice and needless cumulation.[9]

---

(…continued)

instance, he argues, to no effect, that the similarity requirement was not satisfied because "only one" of the five points of similarity the trial court observed between the four women's narratives "had anything to do with consent." Accordingly, because Defendant does not dispute that the issue of fabrication was in bona fide dispute, that the four women's narratives were sufficiently similar to rebut his charge of fabrication, that the women's accusations were independent of each other, or that Defendant has been accused of abusing young women more often than is typical, we need not address these matters further.

9. Defendant maintains that, on the contrary, "the probative value of the evidence was extremely low." However, in arguing the point, Defendant assumes that proving Victim's lack of consent "was the only legitimate noncharacter purpose" for which the women's testimony might be admitted. Since we have already concluded that rebutting Defendant's fabrication

(continued…)

¶33    The logic of the State's strategy for rebutting Defendant's fabrication defense was this: the more often the jury heard of Defendant's same basic ruse from independent sources, the more likely it would be to conclude that Victim's story was genuine rather than a fabrication. So while putting three women on the stand to share their accounts might have resulted in the presentation of some cumulative evidence, in this case the evidence was not *needlessly* cumulative. And the likelihood of the State convincing the jury that Victim was telling the truth increased in direct proportion with the level of similarity exhibited by the other women's narratives. Accordingly, while the three witnesses' accounts admittedly had some potential to create unfair prejudice, the remarkable level of similarity between the four women's narratives rendered their testimony exceedingly probative on the question of fabrication. The trial court scrupulously enumerated these similarities in its order permitting the State to introduce its rule 404(b) evidence:

> (1) the victims were all younger women;
>
> (2) each victim had only a slight or casual acquaintance with [Defendant] with no prior romantic involvement;
>
> (3) each of the victims was lured to [Defendant's] office under promises of employment or stardom;
>
> (4) all four of the assaults occurred in settings where [Defendant] was isolated with the victim; and
>
> (5) in each instance, the victim verbally and/or physically resisted the assault after becoming aware of what was really happening.

---

(…continued)
defense was a permissible purpose under rule 404(b), we need not further address Defendant's probativeness argument.

Given these compelling points, we would be hard pressed to conclude that the court abused its discretion in determining that the probative value of the women's testimony was substantially outweighed by the danger of *unfair* prejudice or *needless* cumulation.

¶34    Finally, we note that the court further mitigated the danger of unfair prejudice by providing a limiting instruction, which cautioned that the three women's testimony was "not admitted to prove a character trait . . . or to show that [Defendant] acted in a manner consistent with such a trait." While "[w]e have no delusion that a limiting instruction can undo serious prejudice, . . . Utah courts have recognized that limiting instructions nevertheless reduce somewhat the danger of improper prejudice." *State v. Peters*, 796 P.2d 708, 712 (Utah Ct. App. 1990) (citation omitted). "Especially in light of [the court's] instruction [in this case], we conclude that the possibility the jury would convict on an improper basis was remote." *See State v. Lomu*, 2014 UT App 41, ¶ 33, 321 P.3d 243.

¶35    We conclude that the State offered the other women's testimony for a proper noncharacter purpose and that the probative value of their testimony was exceedingly strong relative to the dangers of unfair prejudice and needless cumulation of evidence. Accordingly, Defendant has not convinced us that the trial court abused its discretion in determining that the State's rule 404(b) evidence was admissible.

### III. Exclusion of Witnesses

¶36    Defendant maintains that the trial court's order excluding his witnesses at trial was "so sweeping" that it "completely stopped [him] from presenting any meaningful defense," thereby violating his rights to due process under the federal and state constitutions. Because Defendant has not demonstrated that he was prejudiced by the error he ascribes to the court, we reject his argument.

¶37    Before trial, the trial court ordered the parties to exchange witness lists, along with summaries of their witnesses' proposed testimony. Defendant provided a list of witnesses that included—remarkably enough—a judge, the Salt Lake County District Attorney, and the Utah Attorney General. He did not, however, provide a summary of their proposed testimony or offer any reason to believe that their testimony was relevant to his case. Despite two court orders directing that he remedy his omission, Defendant failed to provide the summaries prior to trial. As a result, the court excluded his proposed witnesses as a sanction for violating its discovery orders.

¶38    We need not comment on the propriety of the court's sanction, or even on the strength of Defendant's constitutional claim, to resolve the issue at hand. "Unless an appellant demonstrates that an error is prejudicial, it will be deemed harmless and no appellate relief is available." *Huish v. Munro*, 2008 UT App 283, ¶ 8, 191 P.3d 1242 (citations omitted). *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). By failing to proffer a summary of his proposed witnesses' testimony, Defendant foreclosed his ability on appeal to demonstrate that he was prejudiced by the court's action. "Where the complaint on appeal is about the exclusion of evidence, it is essentially impossible to demonstrate prejudice in the absence of a proffer of what the excluded evidence would show." *Huish*, 2008 UT App 283, ¶ 8. We therefore conclude that there was no reversible error in the court's decision to exclude Defendant's witnesses.[10]

---

10. Defendant has filed several motions and letters expressing his displeasure with his appellate counsel and asks us "to remand his appeal to address conflict of appellate counsel." This is a bit of a surprise, as Defendant, after initially complaining of a lack of communication with counsel, filed a letter indicating that he had consulted with his appellate counsel and established "channels of communication." Defendant now claims that

(continued…)

CONCLUSION

¶39 For the foregoing reasons, we reject Defendant's ineffective assistance claim, and we further conclude that the court did not err in admitting the State's rule 404(b) evidence or in excluding Defendant's proposed witnesses. Accordingly, we affirm.

————————

(…continued)
appellate counsel did not thoroughly address his arguments, but he does not provide any explanation for what counsel should have done differently. We therefore deny his motions and decline to take any action on his letters.