2020 UT App 27

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RONALD JAY RICHINS,
Appellant.

Opinion
No. 20180643-CA
Filed February 21, 2020

Third District Court, West Jordan Department
The Honorable Katie Bernards-Goodman
No. 171403503

Sarah J. Carlquist, Attorney for Appellant

Sean D. Reyes, Thomas B. Brunker, and Nathan Jack,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGE DIANA HAGEN concurred. JUDGE GREGORY K.
ORME concurred, with opinion.

CHRISTIANSEN FORSTER, Judge:

¶1    A jury convicted Ronald Jay Richins of lewdness. He now appeals, asserting that the district court erred in allowing evidence of four previous instances of similar lewd behavior to be introduced at trial. We affirm.

BACKGROUND

¶2    On a May 2017 morning, a fifteen-year-old girl (Victim) was leaving her house for school, driven by her mother (Mother) in the family minivan. Victim saw Richins in his yard as they backed out of their driveway and drove past his house. Victim

was accustomed to seeing Richins every morning, noting, "He always stands out in his yard and chain smokes and looks over into our yard." But this morning, the situation was a little different. Victim said, "[H]e wasn't smoking this morning. His hands were down by his genital area, and there was an abnormal amount of flesh, and he was clearly holding something. . . . And he was wearing dark Levis, so I could tell that there was flesh there . . . ." Victim elaborated that Richins's hands were making a "back and forward motion" and "[i]t kind of looked like he might have been masturbating." But Victim admitted, "From where I was, of course it wasn't 100 percent clear to me, but it certainly looked like he was holding something down near his pockets. So maybe his thumbs were in his pockets . . . ." Victim recalled feeling "disgusted" and telling Mother not to look. Naturally, Mother looked, exclaiming, "Oh my gosh." Mother continued the drive to school, all the while asking Victim about the incident. Mother reported the incident to the police after she returned home.

¶3 A few months later, a detective interviewed Victim, Mother, and Richins.[1] Victim told the detective that Richins's zipper was down, the flaps of his jeans were open, and it appeared that his penis was in his hands. But she also told the detective it was possible that Richins had his hands in his pockets, as opposed to touching his genitals, admitting that she "didn't exactly see what he had in his hands." Mother told the detective that she "took a quick glance" at Richins after being alerted by Victim and that she recalled that he had his hands down in front. But she did not claim to see his zipper open or motions that indicated he was masturbating. For his part,

---

1. The interviews took place in late August, about three months after the incident. The record is unclear about the reason for the delay, other than the detective saying, "It takes some time for us to get them."

Richins denied any misconduct, even after the detective told him that two witnesses had "positively" said he was exposing himself. But Richins admitted that he was standing in the yard on the day in question, most likely smoking a cigarette. Richins also told the detective that Victim's father had come over to talk to him sometime after the incident.

¶4     The State charged Richins with one count of lewdness and filed notice before trial of its intent to use evidence of Richins's prior acts of lewdness pursuant to rule 404(b) of the Utah Rules of Evidence. At a hearing on the rule 404(b) motion, the State argued that evidence of Richins's prior acts of and convictions for lewdness was admissible for a proper noncharacter purpose, namely to show that Victim was not mistaken in her statement that she saw Richins exposing himself that morning. The State additionally argued that the rule 404(b) evidence was admissible pursuant to the doctrine of chances. Specifically, the State intended to introduce evidence of four separate prior incidents in which Richins had exposed himself. Because Richins asserts that the district court erred in admitting the evidence of those prior acts, we describe the incidents in some detail.

¶5     In November 2013, Richins, standing under a stairwell of an apartment building, was staring at a woman while she was waiting at a bus stop. The woman saw Richins pull down his pants, expose his genitals, and begin touching himself. Richins was found guilty of lewdness for this act.

¶6     In September 2007, Richins pulled up next to a school bus transporting junior-high students. Richins mouthed, "I love you," to some of the girls on the bus, who noticed that he was fondling his exposed genitals as he was driving alongside. Richins pleaded guilty to two counts of lewdness.

¶7     In July 2007, two women who were horseback riding noticed Richins watching them and began to feel uneasy. The women encountered Richins down the trail, where he had his

pants down to his thighs and was masturbating. The women continued on, but they ran into Richins again about 100 yards down the trail, where they saw him masturbating a second time. Richins confessed to exposing himself and masturbating.

¶8 The final incident happened in May 2007 and involved Richins exposing himself to a woman in a parking lot. The woman recalled feeling uncomfortable as she noticed Richins, sitting in his truck a few stalls away, watch her enter a store. When she finished shopping and came out of the store, the woman reported that Richins had parked his truck, windows rolled down, right next to her vehicle. As she walked past his truck, she saw that Richins had exposed himself and was masturbating. Richins said "hi" to her as she passed.

¶9 The district court granted the State's motion to admit the other-acts evidence. The court reasoned that Richins saying, "I didn't do it," was roughly equivalent to "claiming [that Victim is] either fabricating or mistaken" and that admitting the other-acts evidence therefore would be for "a proper noncharacter purpose." In fact, Richins's trial counsel expressly agreed with the district court that Richins's defense of "I didn't do it" meant that Victim "didn't see what she thought she saw. She was mistaken in what she saw." Rather than providing details of the prior acts being admitted, the parties agreed that the following stipulation be presented at trial: "On four separate occasions from 2007 to 2013 four different women indicated that Mr. Richins exposed his penis to them and touched his penis in their presence. None of these women knew Mr. Richins, or each other, or welcomed his conduct. Two of these incidents resulted in convictions." The district court also ruled that the other-acts evidence was not unfairly prejudicial pursuant to rule 403 of the Utah Rules of Evidence. The court stated that while the "proposed evidence is clearly prejudicial," "it would not result in 'unfair prejudice' that substantially outweighs its probative value." The court reasoned, "[B]ecause all of the prior victims

are discussing [a] lewdness allegation and not a more serious sexual offense[,] the prejudicial effect of the evidence will be muted."

¶10 At trial, the State briefly referenced the stipulation about Richins's other acts in its opening statement: "You will hear evidence that four separate women on four separate occasions indicated that from 2007 to 2013, Mr. Richins exposed himself to them. Reached down, touched his penis. Because of this evidence and the evidence of [Victim], we'll be asking you to return a guilty verdict." In his opening statement, Richins's counsel explained that it was well known in the neighborhood that his client had "been in trouble before" and that Victim knew of Richins's reputation and "thought that he was creepy."

¶11 In her testimony, Victim admitted that she had never talked to Richins, who was her next-door neighbor, even though she had lived in the neighborhood since she was about seven years old. She explained that her parents told her "not to go near [Richins] or his house because all [their] neighbors warned [them] about him." When she was younger, she did not know why her parents issued the warning, but by the time of the incident, Victim knew that Richins was on the sex offender registry because her parents had informed her of his status. However, Victim clarified that she did not know the reason Richins was on the registry and that she had never looked up Richins on the registry. Victim admitted that she thought Richins was "creepy" and that he made her feel "uncomfortable."

¶12 Mother testified that she had been made aware by multiple neighbors that Richins was required to register as a sex offender and that she warned Victim, "Don't go into his yard. Don't talk to him. Just stay away from the neighbor." However, Mother denied ever telling Victim why Richins was on the registry, clarifying that she did not tell Victim about prior allegations or why Richins was on the registry because she

herself did not know. She also testified that Victim typically tries not to look in the direction of Richins's yard because "it's an uneasy feeling that he's always looking into [their] yard." Mother admitted that she spoke to Richins only once during the ten years she lived in the neighborhood. When asked if she ever shared her impression that there was "something creepy" about Richins with Victim, Mother responded, "I don't think that she needed me to say anything about it. I think that anybody, any reasonable person in our situation would feel the same way." Mother shared the following example to illustrate her point:

> Any time [Victim] or I were out in the yard, [Richins] would come and stand [in his yard] and smoke cigarettes and stand and look directly into our yard. He would never stand and look across the street. He would never look into his own yard. He was always peering into our yard. . . . When I would be working in the garden, he would come and stand right at the fence line and look into the garden. There was multiple occasions that I could literally lay back and probably touch his feet he was standing so close, and he'd just stand out there and smoke.

Richins's counsel pressed Mother on her reason for avoiding Richins, asking her, "[D]o you think your feeling fearful of [Richins] or feeling uncomfortable around [Richins] could have anything to do with living next to someone for ten years and never talking to him?" Mother denied any such connection, and instead testified, "Had I never heard that he was on the sex offender registry, and he still displayed the behavior that he did, he would still make me uneasy."

¶13    The court read the stipulation to the jury at the close of the State's case and again during recitation of the jury instructions. Jury Instruction 31, which was read immediately

after the stipulation, cautioned jurors that they "may consider this evidence, if at all, for the following limited purposes. One, to rebut a claim that a witness was mistaken [in] what she . . . [saw] on the date in question. Two, to rebut the idea that a witness's testimony was the result of fabrication." The instruction also stated,

> This evidence was not admitted to prove a character trait of the defendant or to show that he acted in a manner consistent with such a trait. Keep in mind that the defendant is on trial for the crime charged in this case, for that crime only. You may not convict a person simply because you believe he may have committed some other acts at another time.

¶14 In his closing statement, Richins's counsel expressly stated that years of being warned about the danger posed by Richins caused Victim to have a "confirmatory bias" against him: "[I]f over ten years you've been told by your parents, 'This guy is creepy. . . . And you are not to ever talk to him. You are not to ever engage him,' I'm just saying to you that's going to create some sort of a bias against this person." Richins's counsel suggested that Victim was thus "preconditioned to think that something bad might happen." Counsel argued that instead of actually seeing Richins expose himself, perhaps Victim was "so prejudiced or so biased or so afraid of . . . Richins that she's just mistaken."

¶15 The jury convicted Richins of lewdness, and Richins appeals.

## ISSUE AND STANDARD OF REVIEW

¶16 The sole issue is whether the district court erred in admitting evidence of Richins's prior acts of lewdness pursuant

to rule 404(b)(2) of the Utah Rules of Evidence. "Appellate courts review a trial court's decision to admit character evidence and prior bad acts under an abuse of discretion standard." *State v. Balfour*, 2018 UT App 79, ¶ 21, 418 P.3d 79 (quotation simplified).

ANALYSIS

I. Plausible Noncharacter Purpose

¶17 Richins first argues that the district court erred in admitting evidence that he had exposed himself and touched his genitals on four different occasions and in front of four different women. But we conclude that the court acted within the scope of its discretion because this evidence was admitted for a plausible noncharacter purpose pursuant to rule 404(b) of the Utah Rules of Evidence.

¶18 Rule 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). Thus, if the evidence's purpose is "only to show the defendant's propensity to commit crime," it must be excluded. *State v. Nelson-Waggoner*, 2000 UT 59, ¶ 18, 6 P.3d 1120 (quotation simplified). But such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Utah R. Evid. 404(b)(2). For the following reasons, we conclude that the district court did not err in admitting the other-acts evidence.

¶19 "Rebutting a fabrication defense does not appear in the list of permissible noncharacter purposes set out in rule 404(b)." *State v. Balfour*, 2018 UT App 79, ¶ 31, 418 P.3d 79. But

this list is not exhaustive. Rule 404(b) is an inclusionary rule. Prior bad act evidence is only excluded where the *sole* reason it is being offered is to prove bad character or to show that a person acted in conformity with that character. Thus, so long as the evidence is not aimed at suggesting action in conformity with bad character, it is admissible under rule 404(b).

*State v. Pullman*, 2013 UT App 168, ¶ 31, 306 P.3d 827 (quotation simplified).

¶20 Indeed, our supreme court has adopted the view that rebutting a fabrication or false accusation defense is a permissible noncharacter purpose for admitting other-acts evidence. *State v. Verde*, 2012 UT 60, ¶ 46, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. As stated in *Verde*,

In some circumstances, evidence of prior misconduct can be relevant under the so-called "doctrine of chances." . . . It is a theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over. Under this analysis, . . . evidence of past misconduct may tend to corroborate on a probability theory that a witness to a charged crime has not fabricated testimony, because it is unlikely that several independent witnesses would concoct similar accusations.

*Id.* ¶ 47 (quotation simplified).[2] And as the *Verde* court made clear, the admission of other-acts evidence is not limited to

---

2. Our supreme court's articulation of the doctrine of chances is controlling, *see Eldridge v. Johndrow*, 2015 UT 21, ¶ 20 n.3, 345

(continued…)

rebutting a defense of intentional fabrication. It also extends to false accusations more broadly:

> An innocent person may be *falsely accused* or suffer an unfortunate accident, but when several independent accusations arise or multiple similar "accidents" occur, the objective probability that the accused innocently suffered such unfortunate coincidences decreases. At some point, the fortuitous coincidence becomes too abnormal,

---

(…continued)

P.3d 553 ("Lower courts are obliged to follow the holding of a higher court, as well as any judicial dicta that may be announced by the higher court." (quotation simplified)), but we note that the application of the doctrine in certain contexts has faced recent criticism, *see State v. Lane*, 2019 UT App 86, ¶¶ 37–45, 444 P.3d 553 (Harris, J., concurring); *State v. Murphy*, 2019 UT App 64, ¶¶ 53–63, 441 P.3d 787 (Harris, J., concurring). Like Judge Harris, we question the wisdom of applying the doctrine of chances to rebut charges of fabrication or mistake on the part of an accusatory witness. *See Murphy*, 2019 UT App 64, ¶¶ 57–59.

The doctrine of chances, as currently applied, permits the prosecution to use prior accusations to infer guilt based on the theory that an innocent person is statistically unlikely to be the subject of multiple false accusations. But the logical relevance of such evidence is premised not on the improbability of a person being falsely accused multiple times, but on the improbability of a person being falsely accused this time if the prior accusations are true. In other words, the conclusion that the witness saw Richins expose himself is more likely only if the jury assumes that the prior accusations are true, meaning that Richins exposed himself to strangers on at least four other occasions. When used in this way, "it becomes extremely difficult to distinguish such evidence from straight-up propensity evidence." *See id.* ¶ 59.

> bizarre, implausible, unusual or objectively improbable to be believed.

*Id.* ¶ 49 (emphasis added) (quotation simplified); *see also State v. Lowther*, 2017 UT 34, ¶ 23, 398 P.3d 1032 ("[T]he doctrine of chances is not limited to cases where the defendant accuses a complaining witness of fabricating her testimony . . . .").

¶21 Richins denies that he asserted as part of the defense that Victim "fabricated or intentionally lied about the claim she raised against him," stating that his defense was instead that Victim was mistaken in her belief that she saw Richins exposing himself because she was "biased," "prejudiced," and "preconditioned" to think that Richins was going to do something wrong or "creepy." But under the principles set forth in *Verde*, this distinction between intentional fabrication and involuntary bias is without significance in our analysis. Whether Victim intentionally lied about seeing Richins expose himself or whether she subconsciously jumped to the conclusion that he exposed himself does not change Richins's basic assertion that he was *falsely accused*. And while Richins may not assert that Victim intentionally fabricated the accusation, there is no doubt that his defense centered on the notion that Victim at least mistakenly accused—whether through bias or preconditioning—Richins of exposing himself. As Richins's counsel argued to the jury in closing, "[I]f you have a bias to begin with, you certainly can be mistaken if you see something that's ambiguous but you are preconditioned to think something else. You're preconditioned to think that something bad might happen."

¶22 Thus, we conclude that the district court did not err in permitting the State to offer evidence of Richins's prior acts of exposing himself to other women to rebut Richins's defense that Victim falsely accused him of exposing himself to her.

II. Foundational Requirements of the Doctrine of Chances

¶23  Richins next argues that the other-acts evidence was inadmissible under the doctrine of chances because the State did not satisfy all the doctrine's foundational requirements. We disagree. The four foundational requirements for the admission of evidence under the doctrine of chances are materiality, similarity, independence, and frequency. *State v. Lowther*, 2017 UT 34, ¶ 35, 398 P.3d 1032. These "foundational requirements assess whether a body of prior bad acts evidence is being employed for a proper, non-character statistical inference." *Id.* ¶ 21. We address the materiality, similarity, and frequency prongs as they relate to Richins's prior acts.[3]

¶24  "First, under materiality, the issue for which the uncharged misconduct evidence is offered must be in bona fide dispute." *Id.* ¶ 35 (quotation simplified). The issue in "bona fide dispute" here was whether Victim falsely accused Richins of exposing himself and masturbating in front of her. Richins said he did not do it. Victim said that she saw him do it, but she acknowledged that she might have been mistaken. Richins responded that Victim was mistaken in what she saw because she "knew Richins was a registered sex offender . . . and therefore may have, consciously or unconsciously, used that information to shift her doubts [about Richins's behavior on the day in question] toward something sexual, toward something

_____

3. The independence prong "recognizes that . . . each accusation must be independent of the others because the existence of collusion among various accusers would render ineffective the comparison with chance repetition." *State v. Lowther*, 2017 UT 34, ¶ 37, 398 P.3d 1032 (quotation simplified). Because Richins conceded below—and does not challenge on appeal—the satisfaction of the independence requirement, we will not analyze it here.

nefarious." Thus, the other-acts evidence was admitted to rebut Richins's false-accusation defense and in support of the State's position that Victim's testimony accurately described what happened.

¶25   Second, as to similarity, "each uncharged incident must be roughly similar to the charged crime. The required similarity here need not be as great as that necessary to prove identity under a 'pattern' theory. But there must be some significant similarity between the charged and uncharged incidents to suggest a decreased likelihood of coincidence . . . ." *State v. Verde*, 2012 UT 60, ¶ 58, 296 P.3d 673 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. "The similarities between the charged and uncharged incidents must be sufficient to dispel any realistic possibility of independent invention." *Lowther*, 2017 UT 34, ¶ 36 (quotation simplified). Here, the incident involving Victim was not just "roughly similar" to Richins's prior acts of lewdness, it was strikingly similar—Richins, after having stared at a woman, exposed himself in public and began to masturbate in her presence.

¶26   Richins argues that while the charged offense and Richins's prior acts fall into the same general category of conduct, the prior "incidents' context render[s] them dissimilar from the incident at issue here." Specifically, Richins asserts that the prior incidents involved exposing himself to strangers, while the incident here involved a neighbor: "Exposing oneself to strangers is different from exposing oneself to someone [one knows], like a neighbor, because the risk of getting away with the lewd conduct is presumably different depending on whether the victim knows or personally recognizes the perpetrator." But Richins downplays the riskiness of his prior acts in making this argument. For two of the prior incidents, Richins was in his own vehicle when he exposed himself, making it very easy to identify him. The other two incidents happened in areas where Richins

was also easily identified and apprehended. Richins also finds meaningful that Victim knew he was required to register as a sex offender while none of the women in the prior incidents had this knowledge, suggesting that Victim's account merely echoed the previously reported behavior. But in making this assertion, Richins fails to mention that neither Victim nor Mother were aware of the specific conduct that led Richins to register as a sex offender. It is unlikely that Victim and Mother would have invented conduct that turned out to be so similar to Richins's earlier episodes.[4]

¶27　Third, as to frequency, "the defendant must have been accused of the crime or suffered an unusual loss more frequently than the typical person endures such losses accidentally." *Verde*, 2012 UT 60, ¶ 61 (quotation simplified). Here, the State presented four strikingly similar prior acts of lewdness committed by Richins. In response, Richins argues that the State did not present "real data related to the frequency rate by which men in the relevant population may be accused of exposing themselves. Rather, the [State] immediately asked the judge to, essentially, rely on 'her common conception' to make a decision

---

4. Richins also finds significance in Victim's doubt expressed to the detective about what she may have seen compared to the unequivocal declarations of the victims in the prior acts. But this argument misses the mark. Her expressed doubt is what facilitates Richins's suggestion that Victim's accusation was a product of mistake, while the unequivocal declarations of the prior victims go a long way in dispelling this suggestion. In any event, the doctrine of chances requires that "each uncharged incident must be roughly similar to the charged crime," not that a witness render an unequivocal account of the charged crime. *See State v. Verde*, 2012 UT 60, ¶ 58, 296 P.3d 673 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

regarding frequency." Thus, Richins argues that "[t]o determine frequency here, the question should not be whether Richins has been accused of lewdness more than the typical person, it should be whether he has been accused more than the typical registered sex offender because [Victim], unlike his past accusers, knew he was a registered sex offender." But we note that Utah courts have never required such tailoring of data to reflect the number of accusations against a specific population. Richins cites no case law—from any jurisdiction—in support of his position.[5] Furthermore, Richins again ignores that Victim did not know the details of Richins's past acts. She knew he was on the registry, but she did not know the specific conduct that landed him there. In short, we are not persuaded that being accused of the same lewd conduct on five separate occasions by five different women is in any way typical of the comparative population, even if the inquiry is limited to those listed on the registry.

¶28    We conclude that the other-acts evidence presented by the State satisfied the doctrine of chances' foundational requirements and that the State therefore offered the evidence to show permissible statistical inferences.

### III. Prejudice

¶29    Finally, Richins contends that even if the other-acts evidence was relevant and admitted for a noncharacter purpose, the probative value of the other-acts evidence was substantially outweighed by the danger of unfair prejudice. *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative

---

5. Utah courts have typically applied the frequency prong of the doctrine of chances without resort to statistical data, instead relying on common human experience. *State v. Lopez*, 2018 UT 5, ¶ 59, 417 P.3d 116; *Verde*, 2012 UT 60, ¶ 61. *But see Murphy*, 2019 UT App 64, ¶ 26.

value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). As this court recently stated,

> Even if the evidence may sustain both proper and improper inferences under rule 404(b), courts must balance the inferences against each other under rule 403, excluding bad acts evidence if its tendency to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose.

*State v. Lane*, 2019 UT App 86, ¶ 22, 444 P.3d 553 (quotation simplified). "Of importance here is that the probative value of the evidence must be *substantially* outweighed by the danger of *unfair* prejudice; and unfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis. Given this bar, we indulge a presumption in favor of admissibility." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Thus, the question here is not whether the other-acts evidence identified in the stipulation prejudiced Richins, for it certainly did. That is, revealing to the jury Richins's past lewd conduct undoubtedly cast him in a bad light. But as we have been told by our supreme court, the probative value of several witnesses' independent testimony of substantially similar events is high, and the frequency of the occurrence of those events justifies a rule 404(b) inference. So the question is whether the statistical inference (namely, the unlikely chance that Victim mistakenly saw nearly identical behavior from Richins that four other women had seen) is substantially outweighed by unfair prejudice (namely, that the jury would base its decision solely on Richins's propensity to commit lewd acts).

¶30 Here, the State argued the other-acts evidence was admissible to make "a proper, non-character statistical inference: the objective improbability of the same rare misfortune befalling one individual over and over." *State v. Lowther*, 2017 UT 34, ¶ 39, 398 P.3d 1032 (quotation simplified). That four other women saw Richins do essentially the same thing as Victim said she saw him do supports the inference that Victim did not falsely accuse Richins. In conducting its rule 403 analysis, the district court reasoned that because evidence of the previous lewd acts was no more egregious or offensive than Victim's testimony, any prejudice the other-acts evidence, might create was too minimal to substantially outweigh its probative value. Thus, the district court concluded that introducing the other-acts evidence did not amount to unfair prejudice:

> The proposed evidence is clearly prejudicial but it would not result in "unfair prejudice" that substantially outweighs its probative value. The court finds that because all of the prior victims are discussing [a] lewdness allegation and not a more serious sexual offense[,] the prejudicial effect of the evidence will be muted.

¶31 While a more thorough consideration of rule 403 would have aided our review on appeal, we agree with the district court's ultimate determination that the potential for prejudice or confusion from admitting the evidence of Richins's other lewd behavior did not substantially outweigh the probative value of that evidence. First, we have already concluded that the State offered the other-acts evidence for the purpose of rebutting Richins's mistake and fabrication defenses. *See supra* ¶¶ 17–22. At trial, the State emphasized that the other-acts evidence was relevant to establish the improbability that Victim was mistaken in what she saw rather than Richins's general propensity. Moreover, the parties agreed to a stipulation that greatly sanitized the facts of the prior incidents and that eliminated the

opportunity for live victim testimony, which most certainly would have had a greater impact on the jury. Most significantly, the district court instructed the jury that the evidence of Richins's prior acts was to be used only for the limited purpose of rebutting claims of mistake or fabrication and "was not admitted to prove a character trait of the defendant." In light of this limiting instruction, we agree with the State "that the possibility the jury would convict on an improper basis was remote." *See State v. Lomu*, 2014 UT App 41, ¶ 33, 321 P.3d 243.

## CONCLUSION

¶32    We conclude that the district court did not err in admitting the rule 404(b) evidence concerning Richins's prior acts because there was a noncharacter purpose supporting its admission. Furthermore, we conclude that this evidence satisfied the foundational requirements of the doctrine of chances as articulated by *Verde*. And we uphold the district court's determination that the prejudice in admitting the other-acts evidence did not substantially outweigh its probative value.

¶33    Affirmed.

————————

ORME, Judge (concurring specially):

¶34    I concur in the court's opinion, with the exception of footnote 2. I am more comfortable with our established jurisprudence concerning the doctrine of chances than are some of my colleagues. I do not share the concerns expressed in footnote 2 and do not join in that part of the court's opinion.

————————