**2021 UT 50**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

RONALD JAY RICHINS,
*Petitioner.*

No. 20200228
Heard April 14, 2021
Filed August 19, 2021

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Katie Bernards-Goodman
No. 171403503

Attorneys:

Sean D. Reyes, Att'y Gen., Nathan H. Jack, Asst. Solic. Gen.,
Thaddeus May, Salt Lake City, for respondent

Sarah J. Carlquist, Salt Lake City, for petitioner

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1   A teenager being driven to school reported seeing Ronald Jay Richins standing in his yard and moving his hands in front of his pants in a way that suggested he was masturbating. The State charged Richins with lewdness.

¶2 The State sought to introduce evidence of four prior occasions when Richins had been accused of exposing and/or stimulating himself in public. Over Richins's objection, the district court admitted the evidence. The district court reasoned that the doctrine of chances permitted the State to introduce evidence of Richins's prior acts to establish the unlikelihood that his teenaged

neighbor was mistaken about what she had seen. The jury convicted Richins.

¶3 Richins sought review in the court of appeals. That court affirmed Richins's conviction but expressed concerns about the way this court has articulated and applied the doctrine of chances. We agree with a majority of the court of appeals that the doctrine of chances presents a set of challenges for the courts tasked with applying it. This causes us to conclude that if the doctrine of chances is to remain part of our jurisprudence, it needs to be more carefully explained and more precisely employed. But we disagree with the court of appeals that the doctrine was correctly applied to admit the evidence in this case. We reverse the court of appeals, vacate Richins's conviction, and remand for a new trial.

## BACKGROUND

¶4 Richins's next-door-neighbor (Neighbor) was driving her fifteen-year-old daughter (Daughter) to school. Daughter saw Richins standing in his yard. When a detective interviewed Richins three months later, he said that he was out for a smoke. Neighbor and Daughter told the detective a different story.[1]

¶5 Daughter said she saw Richins with "his hands down near his genital area." She "could tell that there was flesh there . . . and he was obviously holding something." She said she saw a "back and forward motion" and "[i]t kind of looked like he might have been masturbating."

¶6 But Daughter also said that she "didn't exactly see what [Richins] had in his hands." She conceded that "it's possible that I saw his hands in his pocket." Daughter also said she wasn't one hundred percent sure what Richins was doing.

¶7 As they drove past, Daughter had told Neighbor not to look at Richins. Neighbor looked. Neighbor said that Richins "appeared to be standing with his hands just kind of clasped down in front of him." There was nothing else Neighbor could observe from her vantage point. She acknowledged that Richins "may have just had his hands clasped in front of him. That's all I saw."

---

[1] Each of the facts we include in the background section came into evidence through the testimony of one or more of Neighbor, Daughter, and the detective who investigated this case.

¶8 Daughter may have had reasons to perceive that Richins was engaged in something untoward. Daughter thought Richins was "creepy" and said that he made her feel "uncomfortable." Neighbor also told police that Richins was a "creepy guy." Neighbor, who knew that Richins was a registered sex offender, had told Daughter to "watch out" for Richins. Neighbor told Daughter "not to go near [Richins] or his house because all our neighbors warned us about him." Neighbor had given Daughter a "parental warning" consisting of: "Don't go into his yard. Don't talk to him. Just stay away from" Richins.

¶9 When a detective spoke with Richins about Daughter's report, the detective told Richins that two people were "certain" he had exposed himself. Richins maintained his innocence.

¶10 The State charged Richins with lewdness by a sex offender. Before trial, Richins's counsel sought to have the State disclose any evidence it would seek to admit under rule 404(b) of the Utah Rules of Evidence.[2] The State responded that it intended to introduce four separate incidents where Richins had exposed himself to women or was alleged to have done so (the other-acts evidence).

¶11 In the first incident, a woman noticed Richins looking at her as she entered a shopping center. When she exited, she saw that

---

[2] Utah Rule of Evidence 404(b) prohibits the use of crimes, wrongs, or other acts as character evidence. Character evidence is evidence of a person's good or bad character—whether or not they are a "generally good-hearted person with positive qualities." *State v. Gallegos*, 2020 UT App 162, ¶ 36, 479 P.3d 631. Character evidence also includes evidence of "specific traits or propensities [a] person might have, some of which might be negative even if the person could be considered generally a good person." *Id.* Utah Rule of Evidence 404(b)(1) provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah Rule of Evidence 404(b)(2) provides that this "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "This list is not exhaustive, however, and evidence demonstrating other purposes is not precluded so long as the evidence is offered for a legitimate purpose other than to show the defendant's propensity to commit the crime charged." *State v. Allen*, 2005 UT 11, ¶ 17, 108 P.3d 730.

Richins had moved his car near hers. As she returned to her car, she saw Richins's discernibly turgid member. She also saw that he was masturbating. Richins denied the allegations but was cited for lewdness. The ultimate resolution of the case is unclear from the record.

¶12 In the second incident, two women in a park reported seeing Richins expose his penis, make eye contact, and begin to masturbate. Richins admitted to masturbating in front of the women and was arrested. The final resolution of the case is unclear from the record.

¶13 In the third incident, Richins was seen masturbating while driving next to a bus of junior high school girls. Richins mouthed "I love you" to some of them. Richins pled guilty to two counts of lewdness.

¶14 In the fourth incident, a woman waiting at a bus stop saw Richins pull down his pants, expose his penis, and begin to touch himself. A jury convicted Richins of lewdness.

¶15 The State argued that the other-acts evidence was admissible for two different reasons. The State argued it could be admitted to rebut the assertion that Daughter was "mistaken in what she witnessed." The State also argued the evidence should be admitted under the doctrine of chances.[3]

¶16 Richins countered that no proper noncharacter purpose justified the admission of the other-acts evidence. Richins contended that telling the jury about the four occasions on which he had been accused of public indecency would invite the jury to indulge the "improper inference" that evidence rule 404(b) prohibits. That is, that the evidence would suggest to the jury that he had been pleasuring himself when Neighbor and Daughter drove by because he is the type of guy who pleasures himself publicly.

¶17 Richins also argued that the State had not identified a proper noncharacter purpose for the admission of the evidence. Richins emphasized that he had not raised a defense of mistake, accident, lack of opportunity, or incorrect identification. Therefore,

---

[3] The doctrine of chances is "a theory of logical relevance that 'rests on the objective improbability of the same rare misfortune befalling one individual over and over.'" *State v. Verde*, 2012 UT 60, ¶ 47, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

Richins continued, it would be inappropriate to allow the State to introduce the evidence to rebut defenses he had no intention of raising.

¶18   Richins further contended that the evidence should not be admitted under the doctrine of chances. As Richins highlighted, the doctrine of chances sets forth "four foundational requirements" that must be satisfied before prior-acts evidence can be admitted. *See State v. Lopez*, 2018 UT 5, ¶ 54, 417 P.3d 116. These factors, taken from *State v. Verde*, 2012 UT 60, ¶ 47, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, are: "materiality, similarity, independence, and frequency." *Id.* Richins argued that the other-acts evidence was neither material, similar, nor frequent enough to be admitted under the doctrine.

¶19   Richins argued that the "offered evidence is not material because it does not address a defense raised by the Defendant." Richins claimed that there was "no contested issue of identity or opportunity, nor is there a contested claim of mistake or accident." Richins maintained that "the State is incorrect in asserting that a defense claim that the accuser is mistaken" qualifies as an exception to the rule against character evidence from evidence rule 404(b) because "404(b) refers to a claim of mistake or accident by the defendant; not by a witness or accuser."

¶20   Richins further argued "there are material and contextual differences between the various incidents sufficient that they fail to clear the bar for similarity" and frequency. Richins pointed to the factual dissimilarities between the charged conduct and his other acts. And he focused his argument on the time that had passed since the other acts had occurred. He contended that the other acts had taken place between three and a half and nine years before. According to Richins, the gap in time meant that the acts had not occurred with sufficient frequency to have doctrine-of-chances significance.

¶21   The district court rejected all of Richins's arguments and found the other-acts evidence admissible under rule 404(b). The district court concluded that the evidence was admissible for three different non-character purposes: absence of mistake, rebuttal of a claim of fabrication, and the doctrine of chances.

¶22   The court briefly addressed each of the *Verde* factors:

> The court finds that the proposed 404(b) evidence is material inasmuch as it address[es] issues that are clearly in dispute, namely what [Daughter] saw.

Secondly the court finds that the incidents are similar, inasmuch as they all involve the exact same conduct, that of the defendant exposing himself to women in public. Third the court notes all of the prior incidents involve[] women who have no[] connection to one another. Finally the court find[s] that the State has met the frequency requirement, inasmuch as four allegations in seven years is clearly more accusations that a "typical" person would endure.

¶23   Richins also argued that, even if the proffered other-acts evidence was admissible under rule 404(b), it ought to be excluded under rule 403.[4] By Richins's account, the "jury's duty in this case is simply to determine whether Mr. Richins is guilty beyond a reasonable doubt of the charge of lewdness in this case only." Richins therefore posited that the "jury should not make such a determination by means of considering both proven and unsubstantiated allegations that were made at least three and nine years prior to the one at issue in this case."

¶24   The district court concluded that rule 403 did not bar the admission of the other-acts evidence. The court found that the "proposed evidence is clearly prejudicial but it would not result in 'unfair prejudice' that substantially outweighs its probative value. The court finds that because all of the prior victims are discussing lewdness allegation[s] and not a more serious sexual offense the prejudicial effect of the evidence will be muted."

¶25   In the ruling's wake, Richins's trial counsel and the State stipulated how the prior incidents would be presented to the jury. The stipulation read, "On four separate occasions from 2007 to 2013 four different women indicated that Mr. Richins exposed his penis to them and touched his penis in their presence. None of these women knew Mr. Richins, or each other, or welcomed his conduct. Two of these incidents resulted in convictions."

¶26   Armed with a ruling allowing him to introduce Richins's checkered history, the prosecutor began his opening statement: "I want to talk a little bit about coincidences. This case has some

---

[4] Rule 403 states that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." UTAH R. EVID. 403.

interesting coincidences." The prosecutor noted that he shared the same last name as the alleged victim in the case, even though they weren't related. He then noted that the alleged incident happened on his birthday. "What do those two facts mean?" he asked, rhetorically. "I would submit that it means nothing. Absolutely nothing. Those are just coincidences. Random facts. Random occurrences. They're not data from which you could learn anything."

¶27 "But," he continued, "you'll be hearing about some data in this trial, some probabilities and some things like that, that actually will be firm and strong and sound enough that you can make conclusions based on that data."

¶28 The prosecutor described what Daughter would say she saw Richins do. The prosecutor then told the jury:

> I want to talk a little bit more about coincidences and conclusions. That is not the only evidence you'll receive in this case. You will hear that from the years of 2007 to 2013, you'll be instructed that four separate women on four separate occasions saw the defendant, Ronald Richins, expose himself in a public place. None of these women knew one another. None of these women knew Mr. Richins.

He began to say, "This evidence is powerful because it goes far beyond . . . ." before being interrupted by an objection. After the objection, he concluded, "Because of this evidence," apparently referring to the other-acts evidence, "and the evidence of [Daughter], we'll be asking you to return a guilty verdict."

¶29 The prosecutor returned to coincidences in his closing argument. He recapped the testimony that Daughter had given and then said:

> You've heard from four separate women that have described essentially the same conduct about Mr. Richins. They said they saw his penis, and they saw his hand touching his penis. They saw a very similar thing to what [Daughter] described.
> So ask yourselves, what are the odds that [Daughter's] description is accurate? It's not mistaken. It's not the result of some fantasy or oppressed thought. That is why that evidence is so important.

He said, "So how is it when you apply that to these four separate allegations, right, and then [Daughter's] description of the exact

same conduct essentially, what are the odds of such a misfortune befalling Mr. Richins on five separate occasions?" He continued:

> [B]ased on the evidence presented by [Daughter] and [Neighbor], and based on the stipulation of fact for which you can consider specifically, is [Daughter] mistaken? Is she fabricating this claim? And you can consider the notion that what is the objective improbability of somebody having this bad of luck. It's no coincidence . . . it is a clear, clear, clear conclusion.

¶30 The district court instructed the jury:

> You have heard evidence that four women have made similar allegations to those presented in this trial against Ronald Richins before the act(s) charged in this case. You may consider this evidence, if at all, for the following limited purposes:
>
> > 1) to rebut a claim that a witness was mistaken in what she saw on the date in question;
> >
> > 2) to rebut the idea that a witness's testimony was the result of fabrication.
>
> The evidence was not admitted to prove a character trait of the defendant or to show that he acted in a manner consistent with such a trait. Keep in mind that the defendant is on trial for the crime charged in this case, for that crime only. You may not convict a person simply because you believe he may have committed some other acts at another time.

¶31 The jury deliberated. At some point during the deliberations, one of the jurors sent the court a note asking: "If the jury can't agree on guilty or not guilty, what do we do?" Deliberations continued. The jury convicted Richins of lewdness by a sex offender. Richins appealed.

¶32 The court of appeals affirmed. *See State v. Richins*, 2020 UT App 27, ¶ 33, 460 P.3d 593. On the rule 404(b) issue, Richins argued that the district court erred when it admitted the other-acts evidence to rebut a claim of fabrication. Richins asserted that he never claimed that Daughter "fabricated or intentionally lied about the claim she raised against him." *Id.* ¶ 21. He argued in his briefing that "trial counsel's primary strategy was to show that Daughter herself had doubts about what she may have seen—a strategy different from asserting Daughter had fabricated anything."

¶33   The court of appeals noted that Richins had argued to the jury that Victim was "biased" or "prejudiced" or "preconditioned" to think he committed the offense. *Richins*, 2020 UT App 27, ¶ 14. The court of appeals held that "[w]hether [Daughter] intentionally lied about seeing Richins expose himself or whether she subconsciously jumped to the conclusion that he exposed himself does not change Richins's basic assertion that he was *falsely accused*." *Id.* ¶ 21. And, therefore, "the district court did not err in permitting the State to offer evidence of Richins's prior acts of exposing himself to other women to rebut Richins's defense that [Daughter] falsely accused him of exposing himself to her." *Id.* ¶ 22.

¶34   Richins also argued that the district court misapplied the doctrine of chances. *Id.* ¶ 23. He claimed that the district court had erred when it concluded that the State had established that the other acts evidence had satisfied three of the doctrine of chance's foundational requirements: materiality, similarity, and frequency. *Id.* The court of appeals rejected that argument and held that the district court had correctly concluded that the doctrine's foundational requirements had been satisfied. *Id.* ¶ 28.

¶35   Richins last argued that the district court erred in not excluding the other-acts evidence under rule 403. *Id.* ¶ 29. The court of appeals affirmed the district court's rule 403 determination. Although the court of appeals noted that "a more thorough consideration of rule 403 [by the district court] would have aided our review on appeal," the court agreed with "the district court's ultimate determination that the potential for prejudice or confusion from admitting the evidence of Richins's other lewd behavior did not substantially outweigh the probative value of that evidence." *Id.* ¶ 31.

¶36   Two judges on the panel included a footnote in the opinion setting forth their concerns about the way we have described and applied the doctrine of chances. *See id.* ¶ 20 n.2; *see also id.* ¶ 34 (Orme, J., concurring with exception to footnote 2). Those judges opined that they "question[ed] the wisdom of applying the doctrine of chances to rebut charges of fabrication or mistake on the part of an accusatory witness." *Id.* ¶ 20 n.2.

¶37  Richins petitioned for certiorari review. We granted certiorari on two questions:

> 1. Whether the Court of Appeals erred in concluding
>    that evidence of other acts was admitted for a

permissible noncharacter purpose under the doctrine of chances.

2. Whether the Court of Appeals erred in affirming the district court's conclusion that the probative value of evidence of other acts was not substantially outweighed by any unfair prejudice.

¶38   Richins has not asked us to overturn *Verde* nor to abandon the doctrine of chances altogether, so we do not consider doing either in this opinion. Instead, Richins argues that the court of appeals erred in its analysis of the materiality and frequency prongs of the doctrine of chances. And he argues that the court of appeals erred because the prejudice flowing from the other-acts evidence the district court admitted substantially outweighed its probative value. For these reasons, he asks us to reverse the court of appeals and grant him a new trial.

## STANDARD OF REVIEW

¶39   "On certiorari, we review the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Sanchez*, 2018 UT 31, ¶ 10, 422 P.3d 866 (citation omitted). "[T]he correctness of the court of appeals' decision turns, in part, on whether it accurately reviewed the [district] court's decision under the appropriate standard of review." *State v. Lowther*, 2017 UT 34, ¶ 17, 398 P.3d 1032 (second alteration in original) (citation omitted). "The appropriate standard of review for a district court's decision to admit or exclude evidence is 'abuse of discretion.' A district court abuses its discretion when it admits or excludes 'evidence under the wrong legal standard.'" *Id.* (citations omitted).

## ANALYSIS

### I.   THE COURT OF APPEALS ERRED IN ITS APPLICATION OF RULE 404(b)

¶40   Richins argues that the court of appeals erred when it upheld the district court's decision to admit the other-acts evidence under Utah Rule of Evidence 404(b). Richins first argues that the court of appeals and district court improperly concluded that rebutting a claim of fabrication constitutes a proper noncharacter purpose. Richins next argues that the court of appeals misinterpreted *State v. Verde*, 2012 UT 60, ¶ 47, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, to conclude that the evidence could be admitted under the doctrine of chances.

*A. The Court of Appeals Correctly Concluded That Rebutting*
*a Claim of Fabrication is a Proper Noncharacter Purpose*

¶41   Richins first argues that the court of appeals erred when it held that rebutting a claim of fabrication was a permissible noncharacter purpose for admitting the other-acts evidence. *See State v. Richins*, 2020 UT App 27, ¶¶ 20, 22, 460 P.3d 593.

¶42   Utah Rule of Evidence 404(b)(1) excludes "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." But Rule 404(b)(2) permits the use of prior-acts evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." We have held that this list is not exhaustive such that "evidence demonstrating other purposes is not precluded so long as the evidence is offered for a legitimate purpose other than to show the defendant's propensity to commit the crime charged." *State v. Allen*, 2005 UT 11, ¶ 17, 108 P.3d 730.

¶43   One way to think of rule 404(b)(2)'s list is as circumstances where we have concluded that evidence of past acts might be presented to the jury in a way that will direct the jury away from the improper propensity inference that rule 404(b) is designed to protect against. That is, we recognize the potential for the jury to draw the inference from prior-acts evidence that because the defendant did this kind of thing before, he did it on the charged occasion. And rule 404(b)(1) maintains that such an inference would be improper. But we nevertheless believe that when prior-acts evidence is introduced for another purpose under rule 404(b)(2), we can trust the jury to maintain its focus on the permissible, non-propensity-based inference.

¶44   In *Verde*, we effectively added to rule 404(b)'s list of permissible purposes. There, we adopted the "doctrine of chances" which "defines circumstances where prior bad acts can properly be used to rebut a charge of fabrication." 2012 UT 60, ¶¶ 47, 56. We described the doctrine as "a theory of logical relevance that 'rests on the objective improbability of the same rare misfortune befalling one individual over and over.'" *Id.* ¶ 47 (citation omitted).

¶45   In *Verde*, we reasoned that under the doctrine of chances, prior-acts evidence "tends to prove a relevant fact without relying on inferences from the defendant's character." *Id.* ¶ 51. That is, when presented with evidence to rebut a claim of fabrication under the doctrine of chances, a jury can, at least in theory, examine the evidence to conclude that it is unlikely, as a matter of probability,

that an accuser is fabricating the accusation because of the unlikelihood of an innocent person being accused of the same thing over and over. And it can, again at least in theory, draw that inference without resorting to the inference that rule 404(b) prohibits: that the defendant committed the charged offense because he has a propensity to commit this type of crime. We were willing, therefore, to open the door to prior-acts evidence to disprove a claim of fabrication. *Id.* ¶ 20. But we did so fully aware of the realities of opening that door. We acknowledged "there is a risk of an undue inference that the defendant committed each act because of the defendant's immoral character." *Id.* ¶ 51.

¶46   Richins picks up on our caution about the risk of undue inferences. Richins argues that when evidence is introduced to rebut a claim of fabrication under the doctrine of chances, we ask too much of a trier of fact when we ask it to separate the permissible probability-based inference from the impermissible propensity-based inference.

¶47   Richins explains that, in other contexts, evidence might be admitted with a much-reduced risk that the jury will draw the propensity-based inference. He offers an example. A defendant commits an armed robbery and leaves his gun with a unique serial number at the scene of the crime. The prosecutor obtains evidence that the defendant stole the gun bearing that serial number before the robbery. It is possible that the jury could perceive the evidence that the defendant stole this specific gun as character evidence—after all, it suggests he has a general propensity to steal. This would be an improper inference that we would need to guard against.

¶48   But Richins argues that evidence of the gun store robbery could nevertheless be properly admitted in this hypothetical trial because the evidence's "predominant inference is a non-propensity inference." Richins implies that the jurors are more likely to draw the proper inference that, because we know the defendant stole the gun with this serial number, and that exact gun was left at the crime scene, the defendant was therefore at the crime scene. Under these kinds of circumstances, he argues that "a bright-line often separates" proper and improper inferences. And we can use that bright line to help the jury navigate the boundary between the competing inferences.

¶49   Richins argues that is not the case when evidence is admitted under the doctrine of chances to rebut a claim of fabrication. Richins claims that when the statements of former accusers are admitted to rebut a claim of fabrication, this evidence

does little more than invite the jury to indulge the improper inference that rule 404(b) is aimed at preventing. That is, when the proffered reason for admitting prior acts is to prove that the accuser is not fabricating the accusation, it is far more likely that the jury will conclude that because the defendant engaged in this activity before, he engaged in it in this instance because he is the sort of person who commits this sort of crime.

¶50   Richins acknowledges that *Verde* permitted the State to invoke the doctrine of chances to rebut a claim of fabrication, but he claims that there is some wiggle room in our precedent that would allow us to disavow that use. He points out that *Verde* held that evidence rebutting a claim of fabrication is only "potentially admissible." *Verde*, 2012 UT 60, ¶ 51. *Verde* also cautioned that a "charge of fabrication is insufficient by itself to open the door to evidence of any and all prior bad acts." *Id.* ¶ 55.

¶51   Richins contends that the court of appeals has disregarded these caveats and adopted a "categorical rule" that rebutting a claim of fabrication is a proper noncharacter purpose. He argues that "[t]he court of appeals erred because it allowed a charge of fabrication, riding the coattails of the doctrine of chances, to fling the door on the propensity ban wide open without considering the evidence's true and predominant propensity purpose."

¶52   Moving to the facts of his case, Richins argues that "the only inference the other-acts evidence supported was a strict-propensity inference, and as such, the court of appeals erred when it affirmed the evidence's admission." He posits that "just because the evidence here was dressed-up under the doctrine of chances does not mean it had a proper non-propensity purpose." And he asks us to "hold that [the doctrine of chances] cannot be used to rebut a claim of fabrication."

¶53   Richins raises valid concerns about the application of the doctrine of chances to show that a witness is not fabricating her allegation. We especially take Richins's point that when the State presents prior-acts evidence and uses the doctrine of chances as the analytical model, the gap between the proper and improper inferences can be thin to the point of being theoretical. And we agree with Richins that we are asking a jury to deploy a substantial degree of mental discipline when we ask it to consider a defendant's past acts to assess whether his accuser is making up the allegations, but to simultaneously not consider whether the fact that the defendant has committed the prior acts means he has a propensity to commit those crimes.

¶54 Whatever the merits of Richins's arguments, a major roadblock exists to our casting *Verde* aside. Richins has not expressly asked us to overturn it and therefore has not attempted to meet the burden a party faces when asking us to reverse our precedent. Overturning precedent is not something that we do easily. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553. Without briefing aimed at that burden, we keep *Verde*'s core holding in place and leave open the possibility that, in an appropriate case, a party could employ the doctrine of chances to rebut a claim of fabrication. *See Verde*, 2012 UT 60, ¶¶ 47, 56.

¶55 But Richins's argument, together with the criticism that the court of appeals (in this case and others) has leveled at the doctrine of chances, have convinced us that if the doctrine is to remain part of our jurisprudence, it needs to be employed in a more disciplined fashion and district courts need to be more transparent in explaining their reasoning. We explain the increased rigor we direct the courts to apply as we address Richins's other arguments.[5]

---

[5] When we remand a case for further proceedings, we allow ourselves the discretion to address issues that might arise on remand. *State v. Ogden*, 2018 UT 8, ¶ 25, 416 P.3d 1132. Absence of mistake was one of the three "proper" non-character purposes that the district court held would justify the admission of the other-acts evidence. The district court concluded that the evidence could be admitted because the prior acts were relevant to show that Daughter was not mistaken about what she saw. Richins objected that 404(b)'s reference to absence of mistake only encompasses situations where a defendant asserts a defense of his or her own mistake. In other words, Richins claimed that absence of mistake applies only where a defendant claims that, in a crime with a mens rea element, she did not act with the requisite mental state because she was mistaken. *See supra* ¶ 17.

The court of appeals appears to have not addressed Richins's argument head-on. But at times it referred to "mistake and fabrication defenses" or "mistake or fabrication" in the same breath. *Richins*, 2020 UT App 27, ¶ 31. The State does the same in its briefing to us, referring to "Richins's false-accusation or mistake defenses." To the extent the court of appeals equated fabrication with absence of mistake, we note that those two justifications implicate different doctrine of chances concerns and should be analyzed separately. Also, to the extent absence of mistake was an independent ground to

(continued . . .)

### B. The Court of Appeals Erred in Upholding the District Court's Admission of the Other-Acts Evidence

¶56   Richins next argues that even if prior-acts evidence can be admitted under the doctrine of chances to rebut a charge of fabrication, the court of appeals improperly applied the doctrine. Richins correctly notes that we have permitted use of the doctrine of chances where the evidence's proponent can satisfy four threshold showings: materiality, similarity, independence, and frequency. *Verde*, 2012 UT 60, ¶¶ 57–61. Richins argues that the court of appeals erred because the district court did not have an adequate basis to conclude that the other-acts evidence was material to an issue in "bona fide dispute." Richins also argues that the district court lacked a basis to conclude that the prior acts had occurred with sufficient frequency. We agree with Richins that the district court's analysis did not allow the court of appeals to conclude that the evidence was admitted properly under the doctrine of chances.

1. The Court of Appeals Did Not Err When It Concluded That the Other-Acts Evidence Was Material to a Disputed Issue

¶57   Richins first argues that the materiality requirement of the doctrine of chances was not satisfied. To meet the materiality element of admissibility under the doctrine of chances, "[t]he issue for which the uncharged misconduct evidence is offered '*must be in bona fide dispute.*'" *Verde*, 2012 UT 60, ¶ 57 (citation omitted).

---

admit the evidence, the State has not asked us to affirm the court of appeals on this basis.

Even if the State had, we could not say that the basis was apparent on the record before us. The State has not pointed us to any case in which a court has admitted rule 404(b) evidence to show that the *witness* was not mistaken. We also note that absence of mistake under federal rule 404(b) (which is identical to our rule 404(b) in this respect) is a "subsidiary of the intent exception" and that "evidence can fall under the exception for absence of mistake or inadvertence when it shows defendant was aware of the nature of an act at an earlier point, making it unlikely he would not have known at the time of the charged crime." 2 CRIM. PRAC. MANUAL § 60:7, Westlaw (updated June 2021). We offer no opinion on whether demonstrating that a witness is not mistaken would be a proper non-character purpose, and leave the question for a case in which the issue is briefed.

¶58 We impose this requirement so we can determine "at the threshold whether the evidence is presented for a proper purpose, or only for the purpose of suggesting an improper inference of action in conformity with alleged bad character." *Id.* ¶ 24. Stated differently, we understand that evidence of a defendant's prior bad acts can be powerful evidence that carries with it the potential for the jury to draw both proper and improper inferences.[6] To help ensure that the doctrine of chances does not become an end run around rule 404(b), we ask the district court to analyze whether the prior act evidence is actually material to a disputed issue.[7]

---

[6] To be clear, certain inferences are improper because Utah Rule of Evidence 404(b)(1) prohibits the use of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." But, for some categories of evidence, such as a criminal case where the defendant is accused of child molestation, we expressly permit the jury to consider evidence that the defendant has molested children before to prove a propensity to commit that particular crime. *See* UTAH R. EVID. 404(c). These are questions of policy that reflect our desire to have a system that is fair to defendants, victims, and the public. This case highlights the tension inherent in attempting to simultaneously maintain a bar on character evidence and a doctrine that invites the jury to examine past acts through a probability-focused lens.

[7] For some time, we attempted to impose rigor on the district court's consideration of prior-acts evidence by instructing those courts to "scrupulously examine[]" that evidence before its admission. *See State v. Lucero*, 2014 UT 15, ¶ 36, 328 P.3d 841 (quoting *Verde*, 2012 UT 60, ¶ 13), *abrogated by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. But in *State v. Thornton*, we jettisoned that standard because we concluded it had become "more confusing than helpful." 2017 UT 9, ¶ 47. We reiterated that the tests for admissibility are those of the Utah Rules of Evidence. *See id.* ¶ 54.

When we disavowed the "scrupulously examine" standard, we reinforced the need for a "careful trial judge" to "march[] through the standards set forth in rules 404(b), 402, and 403." *Id.* And we noted that a judge who presents her "analysis on the record" "will be better-positioned" to have her "decision on admissibility of prior misconduct evidence affirmed on appeal." *Id.* We highlight, underscore, bold, italicize, and place in all caps that advice.

(continued . . .)

¶59    Richins argues that the court of appeals incorrectly identified the bona fide dispute in this case. The court of appeals concluded that the disputed issue to which the evidence spoke was "whether [Daughter] falsely accused Richins." *Richins*, 2020 UT App 27, ¶ 24. But that is not what the district court based its materiality ruling on.

¶60    The district court's materiality analysis consisted of a single sentence: "The court finds that the proposed 404(b) evidence is material inasmuch as it address[es] issues that are clearly in dispute, namely what [Daughter] saw." Richins argues that when the district court defines materiality at this level of generality, it revives the "not-guilty rule" that we rejected in *Verde*. *See* 2012 UT 60, ¶¶ 21–22. The "not-guilty rule" provided that a not-guilty plea put every element of a crime at issue. *Id.* In the 404(b) context, this allowed prosecutors to argue that prior-acts evidence could be admitted to show intent, even if the defendant did not focus his defense on the intent element of the crime.

¶61    In *Verde*, we recognized that "the technical relevance of evidence of a defendant's intent is not enough to justify the admissibility of evidence of prior bad acts purportedly aimed at establishing intent under rule 404(b)." *Id.* ¶ 22. We cautioned that "[f]idelity to the integrity of the rule requires a careful evaluation of the true—and predominant—purpose of any evidence proffered under rule 404(b)." *Id.* We further highlighted the need for focused attention on the purpose for which the evidence would be admitted. *Id.* We recognized that focus could help a court discern whether the true purpose of the evidence would be one rule 404(b) renders improper. *Id.* We also recognized that it would assist a court to evaluate whether any permissible purpose is outweighed by the evidence's ability to give rise to an improper inference and whether the evidence's potential to prejudice or confuse the jury outweighs its value. *Id.*

¶62    Those concerns become even more acute when the State intends to use the doctrine of chances to justify the admission of prior-acts evidence. The already-thin gap between the permissible and impermissible inferences can narrow even further when the State is allowed to argue probability to the jury. The ability of the

---

Although failure to create an adequate record is not per se error, we implore the courts tasked with applying the doctrine of chances to explain their reasoning in detail and with precision of thought.

district court to assess the size of the gap, and the corresponding risk that the jury would indulge the improper inference, can be compromised by imprecise thinking. And the ability of an appellate court to assess whether the district court abused its discretion is severely weakened by general and imprecise analysis.

¶63 Although we recognize Richins's concerns, the court of appeals did not revivify the not-guilty rule. The district court defined the issue in dispute as "what [Daughter] saw." That corresponded to the way that Richins intended to defend himself. He did not plan to argue that Daughter made the story up, or directly argue that she was mistaken in what she saw, but rather, in Richins's words, to "highlight Daughter's own doubts about what she may have seen." And it appears that he intended to argue that Daughter had been preconditioned to see him as a creepy letch entirely capable of engaging in highly inappropriate public behavior.

¶64 The district court did not call this a defense of fabrication. Nor did it analyze it as such. But the court of appeals concluded that when the district court referenced "what [Daughter] saw," it was describing a fabrication defense. The court of appeals reasoned that whether Daughter "intentionally lied about seeing Richins expose himself or whether she subconsciously jumped to the conclusion that he exposed himself does not change Richins's basic assertion that he was *falsely accused*." *Richins*, 2020 UT App 27, ¶ 21. The court of appeals concluded that, "under the principles set forth in *Verde*, this distinction between intentional fabrication and involuntary bias is without significance in our analysis." *Id.*

¶65 As an initial matter, we disagree with the court of appeals' assessment that there was no significance in the different ways the district court and the court of appeals described the relevant issue. The distinction may be minor, but it is there. And when we are talking about assessing the jury's ability to distinguish between permissible and impermissible inferences, small distinctions have the potential to take on outsized importance.

¶66 Under the district court's articulation, the State presents the jury with the evidence of Richins's other acts and asks it to conclude that Daughter is likely to have seen what she said she saw because Richins has engaged in this behavior before. Under the court of appeals' rebuttal of the fabrication rationale, the State asks the jury to conclude that it is unlikely that Daughter is making up what she saw because Richins has been accused of similar acts before and the odds of five people fabricating their story are extremely long. Admittedly, the gap between the permissible and impermissible inferences is

extremely slight in both instances. But under the district court's "what [Daughter] saw" rationale, there appears to be even less opportunity to guide the jury away from the impermissible propensity-based inference.

¶67 That having been said, under either articulation, the evidence the State sought to introduce spoke to a material issue that was in bona fide dispute. This case is not like *Verde*, where we discounted the State's argument that it could introduce the prior-acts evidence to demonstrate intent even though Verde had not contested his intent at trial. *See Verde*, 2012 UT 60, ¶ 25. Although Richins gamely attempted to articulate a defense that did not focus on the question of which version of what happened that morning was correct, all paths led to the jury needing to decide whether it believed Richins or Daughter.

¶68 Richins may not have used the word fabrication, but his defense put at issue whether Daughter's account was correct. As such, this is not a case where the State was attempting to sneak in prior-acts evidence by claiming it pertained to an issue it did not. The court of appeals did not err when it concluded that the district court properly found that the other-acts evidence was material.[8]

---

[8] We have stated that the doctrine of chances needs to be applied with care and precision and that the "care and precision begin with the party seeking to admit a prior bad act under the doctrine of chances." *State v. Argueta*, 2020 UT 41, ¶ 34, 469 P.3d 938. "This party must articulate the 'rare misfortune' that triggers the doctrine's application" because "[w]ithout a clear articulation of what event is being evaluated it is difficult to make sure that a prior bad act is admissible under the doctrine for a permissible inference. *Id.*

Here, whatever efforts the State made to assist in this, the district court never defined the rare misfortune that Richins suffered. The closest the district court came was to reference "allegations" when it discussed frequency. Careful thinking about how to define the rare misfortune will assist the court in identifying potential issues with the foundational factors and assist the court in identifying the permissible and impermissible inferences the prior-acts evidence will present to the jury. To pick up on a theme we started in *Thornton*, *see* 2017 UT 9, ¶ 54 & n.6, and continued in *Argueta*, a careful trial judge who wants her doctrine of chances ruling to be upheld on appeal will greatly increase the odds of affirmation if she carefully defines what the rare misfortune at issue is.

2. The Court of Appeals Incorrectly Analyzed Frequency Under the
   Doctrine of Chances

¶69    The frequency element of the doctrine of chances requires that "[t]he defendant must have been accused of the crime or suffered an unusual loss *'more frequently than the typical person endures such losses accidentally.'"* *Verde*, 2012 UT 60, ¶ 61 (citation omitted). Richins argues first that the district court lacked a foundation to conclude that Richins suffered a rare misfortune more frequently than the typical person. Richins also argues that the district court erred when it compared Richins to a "typical person" and not a typical sex offender.

¶70    Richins argues that the court of appeals erred in upholding the admission of the other-acts evidence because the district court did not establish a baseline frequency with which a person could expect the rare misfortune to occur. We agree.[9]

¶71    The district court's entire frequency analysis consisted of the sentence: "[T]he court find[s] that the State has met the frequency requirement, inasmuch as four allegations in seven years is clearly more accusations that a 'typical' person would endure." The court of appeals affirmed the district court's bare-bones finding. *Richins*, 2020 UT App 27, ¶ 27. The court of appeals opined that it was "not persuaded that being accused of the same lewd conduct on five separate occasions by five different women is in any way typical of the comparative population." *Id.* As for what it relied on to reach that conclusion, the court of appeals noted, "Utah courts have typically applied the frequency prong of the doctrine of chances without resort to statistical data, instead relying on common human experience." *Id.* ¶ 27 n.5.

¶72    We agree with Richins that this analysis was inadequate. The district court's finding was based on its own sense of the question—its "intuition" about how frequently the rare misfortune

---

[9] The State argues that Richins did not preserve this argument because he did not ask the trial court to require the State to produce "hard statistical data" to satisfy the frequency factor. It is true that Richins did not ask for hard data below, but he did argue that the events occurred too infrequently to meet the foundational threshold. This was sufficient to preserve the issue that *Verde* and its progeny required the State to establish the predicted frequency of the rare misfortune.

would occur in the general population. And the court of appeals' conclusion was based on the same. *Id.* ¶ 27. We rejected that type of conclusory analysis in *State v. Argueta*, 2020 UT 41, ¶ 39, 469 P.3d 938.

¶73   The State had charged Argueta with burglary and forcible sexual abuse. *Id.* ¶ 8. He allegedly entered someone else's house at night and inappropriately touched a woman while she was in a hypnagogic state. *Id.* ¶ 5. At trial, Argueta testified that he was in the house because the victim's boyfriend owed him $20 and had promised to pay him back whenever Argueta came by his house. *Id.* ¶ 9. Argueta claimed he swung by to pick up the double sawbuck, saw that keys had been left in the front door, worried about the residents' safety, and entered the apartment to put the keys inside. *Id.* ¶ 10.

¶74   To rebut Argueta's story, the district court allowed the State to introduce evidence that Argueta had previously been found trespassing near one woman's house. *Id.* ¶ 11. The district court also permitted the State to tell the jury that Argueta had peeped into another woman's window. *Id.* The district court allowed the evidence to be admitted under the doctrine of chances. *Id.* ¶ 12. The court of appeals held that Argueta did not properly preserve his challenge to the peeping incident but that the trial court erred in admitting the trespassing incident. *Id.* The court of appeals concluded that the trespassing incident was inadmissible because two of the foundational requirements of the doctrine of chances—frequency and similarity—were not met. *Id.* ¶ 36.

¶75   On certiorari review, we noted that the court of appeals had intuited that "[o]ne trespassing conviction does not increase the statistical likelihood that on a different occasion" the defendant had trespassed. *Id.* ¶ 43 (alteration in original) (citation omitted). But we noted that we could not affirm that conclusion because the record lacked a basis to support it. We held that a court cannot assess frequency "solely on intuition." *Id.* ¶¶ 39, 42–43. We concluded that "[t]o evaluate the frequency of a 'rare misfortune,' a court must ascertain some benchmark for the 'typical person['s]' endurance of the crime or unusual loss through testimony or judicial notice." *Id.* ¶ 39 (second alteration in original) (quoting *State v. Lane*, 2019 UT App 86, ¶ 49, 444 P.3d 553 (Harris, J., concurring)). We opined that "[w]ithout such a benchmark, the frequency requirement in *Verde* is only empty words." *Id.*

¶76   In fairness to the district court and the court of appeals in the case before us, we may have been slow to grasp the full scope of

the issues surrounding the use of intuition and common understanding to assess the frequency with which we should anticipate that events will occur. As we see it play out in practice, we grow concerned with the practice of not requiring the State to forward evidence to establish the frequency with which we should expect certain events to occur. For example, in *Argueta* the district court implicitly found frequency satisfied based upon one incident of trespass and one incident of peeping. *See id.* ¶ 11. But the district court did not have anything other than its intuition to guide its decision. *Id.* ¶¶ 42–43. Similarly, courts have, without the benefit of evidence to confirm their general sense of the probability, found frequency satisfied based upon a single prior robbery. *See State v. Lomu*, 2014 UT App 41, ¶ 32, 321 P.3d 243.

¶77 We are becoming increasingly uneasy because when we ask district courts to assess frequency without the benefit of data, we are inviting them to draw on stereotypes and assumptions that may not hold true. This is part of what inspired the *Argueta* court to conclude that courts need to stop trusting their intuition about probabilities and need to establish a baseline from which a frequency analysis can proceed. *See Argueta*, 2020 UT 41, ¶ 39.

¶78 A scholar of the doctrine of chances has posited a hypothetical that helps illuminate that when it comes to assessments of frequency, our intuition may be an unreliable guide. *See* Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove* Mens Rea*: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 OHIO ST. L.J. 575, 586–88 (1990). Professor Imwinkelried analyzes the facts of *United States v. Woods*, 484 F.2d 127 (4th Cir. 1973). In *Woods*, as Professor Imwinkelried explains, the head of an orphanage stood accused of infanticide after a child in her care suffocated. Imwinkelried at 586. The prosecution proposed to introduce evidence that, over a twenty-five year period, twenty other children in the orphanage had suffered cyanotic episodes—episodes of reduced blood flow from the lungs that can lead to suffocation. *Id.* The prosecution offered the evidence under the doctrine of chances to demonstrate that the rate of cyanosis in the orphanage suggests that the cause of the episodes is not accidental. *Id.*

¶79 If we were to rely on our intuition, we might be tempted to conclude that twenty-one cyanotic incidents in the orphanage must be more than what is possible based on chance alone—that they must imply some improper conduct on part of the accused. After all, twenty-one episodes in twenty-five years sounds like an alarming

number. But, as Professor Imwinkelried hypothesizes, if statistics showed that two percent of American children suffer cyanotic episodes, and the accused has cared for 3,000 children during the last two and a half decades, then the children in the accused's care have actually fared better than children who don't live in the orphanage. *Id.* at 591. This helps us understand that we don't always know what we think we know. Developing the relevant baseline matters.[10]

_____

[10] The State argues that we have never required a statistician to opine or required a party to introduce "hard statistical data" in every case. We are not suggesting that the State must call a statistical expert every time it wants to use the doctrine of chances. As Professor Imwinkelried notes, there exist a variety of ways to establish a baseline frequency:

> There may be pre-existing data compilations. Government agencies or private research organizations might have gathered empirical data, for example, in the form of an epidemiological study. The studies may be so authoritative that the data is judicially noticeable, or the study may fall within the learned treatise exception to the hearsay rule.

Imwinkelried at 591 (citations omitted). And, "[i]f the data has not been compiled but it is accessible, the prosecutor can retain an expert to use recognized statistical techniques to gather the data establishing the frequency." *Id.*

Professor Imwinkelried further concludes that "[f]ailing all other methods, the prosecutor can ask the judge to rely on her conception of common, human experience to resolve the question." *Id.* The State echoes this, arguing that a court can take notice of facts within "common experience or knowledge" such as "facts relating in general to the prevalence of crime." But it is this final method that we fear can lead the court into unwitting error. A personal sense of the anticipated frequency with which we would expect an act to occur is not a "fact" that generally relates to the prevalence of crime. Nor is it necessarily within our common experience or knowledge. To guard against the potential to err, a court should require the State to introduce evidence to establish the baseline probability. To be clear, a court may, by following Utah Rule of Evidence 201, take judicial notice of facts not subject to reasonable dispute because they are either "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be

(continued . . .)

¶80   That benchmark is lacking here. The district court relied solely on its own intuition to establish the frequency with which we would expect a typical person to be accused of public masturbation. This was error. The court of appeals erred when it concluded that the district court did not abuse its discretion when it admitted the other-acts evidence under the doctrine of chances.

¶81   Richins also argued to the court of appeals that to establish a baseline, the district court needed to focus on the frequency with which someone in Richins's particular position could have been expected to suffer the rare occurrence. *Richins*, 2020 UT App 27, ¶ 27. The court of appeals rejected this argument, noting that "Utah courts have never required such tailoring of data to reflect the number of accusations against a specific population." *Id.*

¶82   Although Richins argues that this was error, Richins cites to no case in which a court has deviated from looking at the extent to which a typical person would suffer the loss. Nor does Richins engage with the number of cases in which we have held that "*the typical person*" is the proper comparison to assess frequency under the doctrine of chances. *Verde*, 2012 UT 60, ¶ 61 (citation omitted); *see also Argueta*, 2020 UT 41, ¶ 39 (explaining that frequency requires that "the defendant 'must have been accused of the crime or suffered an unusual loss more frequently than the typical person endures such losses accidentally.'" (citation omitted)); *State v. Lopez*, 2018 UT 5, ¶ 57, 417 P.3d 116 (affirming this standard); *State v. Lowther*, 2017 UT 34, ¶ 38, 398 P.3d 1032 (same); *see also Lomu*, 2014 UT App 41, ¶ 32 (same); *State v. Balfour*, 2018 UT App 79, ¶ 31 n.8, 418 P.3d 79 (same).

¶83   Richins instead cites to an article that contends, "Utah courts do not encounter 'typical people' as criminal defendants." Andrea J. Garland, *Beyond Probability: The Utah Supreme Court's "Doctrine of Chances" in* State v. Verde *Encourages Admission of Irrelevant Evidence*, 3 UTAH J. CRIM. LAW 6, 20 (2018). The article's author argues that the odds of being arrested for a crime in Salt Lake County are so low that being accused of a crime just once is already atypical. *Id.* The author thus argues that a criminal defendant will *always* have been accused of a particular crime more times than the typical person—negating the purpose of our frequency prong. *Id.*

---

questioned." *See* UTAH R. EVID. 201(b). But a court should not confuse its assumptions for generally known facts.

¶84 Although Richins does not provide any other authority to support his argument, we note that Judge Harris leveled a similar criticism in *Lane*, 2019 UT App 86, ¶ 49 (Harris, J., concurring). Judge Harris very effectively denounced the district court's analysis that a defendant who had been involved "with three serious assaults in four years" was "not mere accident." *Id.* Judge Harris criticized the district court for reaching that conclusion in the face of the defendant's "chronic homelessness and the higher frequency of assault surrounding shelters." *Id.* Judge Harris reasoned:

> The court did not take any evidence to establish the profile of a "typical" resident of that part of Salt Lake City, or any evidence intended to establish a baseline regarding the number of physical altercations per year in which such a resident might typically be involved. Under these circumstances, I see no reasoned basis for the court's intuition-level conclusion that a person living in that part of the city becoming involved in one fight every fifteen months is necessarily "frequent." Bound up in that analysis are various assumptions by the court—arrived at without evidence—of what living conditions are like for homeless citizens of Salt Lake City. This is an instance where the court, in my view, needed to take additional evidence—from experts, if necessary—to arrive at a sound conclusion about whether the number of assaults in which [the defendant] was involved was atypical for a resident of that part of town.

*Id.*

¶85 Richins and Judge Harris have diagnosed a potential weakness in the doctrine of chances' application. There are undoubtedly people who will suffer certain rare losses at a greater rate than the population at large for reasons unrelated to the random probability rationale that powers the doctrine of chances. To take an extreme example, most people will live their lives without ever being struck by lightning. The National Weather Service estimates an American has only a 1 in 15,300 chance of being struck. *How Dangerous is Lightning?* NAT'L WEATHER SERV., www.weather.gov/safety/lightning-odds (last visited Aug. 5, 2021). But one ranger in Shenandoah National Park claimed to have been struck by lightning seven times. Tom Dunkel, *Lightning Strikes: A Man Hit Seven Times*, WASH. POST MAG. (Aug. 15, 2013), https://www.washingtonpost.com/lifestyle/magazine/insid

e-the-life-of-the-man-known-as-the-spark-
ranger/2013/08/15/947cf2d8-ea40-11e2-8f22-
de4bd2a2bd39_story.html. Although that is an exceptional number,
something might explain the frequency of the misfortune. A ranger
assigned to work outdoors in a mountain range with prevalent
lightning storms is likely to be struck by lightning more frequently
than the typical person.

¶86 We do not believe that the answer to the problem is to
tailor the data so it fits the subpopulation to which the defendant
belongs. This would just breed disputes over how to define the
relevant subpopulation and add another layer of complexity to an
analysis that some of our courts already appear to be struggling to
apply correctly. Rather than open that door, we prefer to emphasize
two existing requirements that should, if applied properly, address
the concerns Richins raises here and Judge Harris raised in *Lane*.

¶87 The first is the independence inquiry that a court must
undertake before it can admit prior-acts evidence under the doctrine
of chances.[11] The non-propensity based probative value of prior-acts
evidence comes from "the improbability of chance repetition of the
same event." *Verde,* 2012 UT 60, ¶ 60 (quoting Mark Cammack, *Using
the Doctrine of Chances to Prove Actus Reus in Child Abuse and
Acquaintance Rape:* People v. Ewolt *Reconsidered*, 29 U.C. DAVIS L. REV.
355, 402 (1996)). As a result, any fact that suggests that the repetition
is not the product of chance tends to show that the prior acts are not
independent of one another. In that instance, something other than
random chance might explain why the defendant has suffered the
rare misfortune more frequently than the typical person.

¶88 For example, we have said that collusion between
witnesses demonstrates a lack of independence. *See Lopez,* 2018 UT 5,
¶ 56 ("The independence requirement helps ensure there is no

---

[11] Perhaps because we have mostly spoken of independence in
terms of collusion, and because there was no evidence of collusion
between Daughter and Richins's other accusers, Richins conceded
independence before the district court. We therefore offer no opinion
on whether the State satisfied its burden of demonstrating that the
prior acts the district court admitted here were independent of one
another. Nor do we opine on what the district court might have done
with an argument that Daughter's allegation was not independent of
the others because Mother had warned Daughter to stay away from
Richins.

collusion between the victims and that the victims have not influenced each other's recollections of what occurred."). In the context of prior accusations, we cannot say that the accusations (and the details underlying those accusations) are truly the product of random chance if the accusers have discussed their accusations.

¶89 But collusion is not the only way to show a lack of independence. In *Lane*, for example, evidence that the defendant frequented a high-crime area where a person will often need to defend himself against violent attack suggests that the two times Lane was previously involved in a fight may not have been the product of random chance. *See Lane*, 2019 UT App 86, ¶ 49 (Harris, J., concurring). A district court should, when assessing evidence through the lens of the doctrine of chances, be on the lookout for those factors that show that the random events a party wants to admit under the doctrine of chances aren't actually random. And if the party seeking admission of the evidence cannot foreclose the possibility that something other than random chance or the probability-based inference she wants the jury to draw from the evidence explains why the defendant has suffered the rare misfortune at an unusual rate, the district court should not admit the evidence under the doctrine of chances.

¶90 The second safeguard exists in a proper rule 403 balancing analysis. District courts must recognize that when they conduct a rule 403 balancing, the doctrine of chances evidence does not have the same probative value when other factors explain why a defendant might suffer a particular loss more frequently than the average person. Similarly, the potential for unfair prejudice is even greater where there is an innocent reason why the defendant experiences the loss more frequently than the typical person.

¶91 *Lane* illustrates this. Lane experienced "chronic homelessness." *See id.* The State charged Lane with aggravated assault after he was involved in a fight that ended with Lane cutting a victim's face three times with a knife. *Id.* ¶¶ 2–3. Lane claimed self-defense. *Id.* ¶¶ 7–8. The State sought to introduce evidence of two other instances where Lane had been involved in fights where he had cut his opponent's face. *Id.* The court of appeals assumed, without deciding, that the evidence could be admitted under 404(b). *Id.* ¶ 21. But the court held that the district court erred because evidence should have been excluded under rule 403. *Id.* ¶ 21-24.

¶92 The *Lane* court reasoned that "it is not highly strange or unlikely that Lane would need to defend himself multiple times over years of living in a high crime area." *Id.* ¶ 24. It also concluded that

the State's proffered use of the evidence would be "substantially outweighed by the unfairly prejudicial inference that Lane has the character of someone who continuously provokes altercations, cuts the faces of his victims, and then claims self-defense." *Id.*

¶93   We can recharacterize the court of appeals' analysis in the language of permissible and impermissible inferences. Assuming that the State could establish the baseline that Lane had been the victim of assaults that required him to defend himself more than a typical person, there are a number of inferences the jury could draw. It could permissibly infer that the fact Lane frequented a high crime area explains why he needed to defend himself so often. It could also permissibly infer that, as the State pressed, Lane fabricated his story of self-defense because he had claimed self-defense a number of times before and a typical person would not need to defend himself that many times. Or, the jury could draw the impermissible inference that he is the sort of person who gets into fights and cuts his opponent.

¶94   The *Lane* court opined that the probative value of the evidence was substantially outweighed by the risk of unfair prejudice. *See id.* ¶ 24. Although the court of appeals did not state so directly, the probative value of the inference that Lane had fabricated his self-defense claims was reduced because the other permissible inference offered another explanation for the frequency of Lane's repeated misfortune. The risk of the jury latching onto the impermissible inference remained high because that risk is always high when we are dealing with prior-acts evidence. As such, the court of appeals correctly concluded that the evidence's probative value was substantially outweighed by the danger of unfair prejudice. *See id.*

¶95   Simply stated, we agree with Richins that courts need to be attuned to factors that might explain why a defendant has suffered a rare misfortune more than the typical person. But we disagree with Richins's conclusion that the way to deal with those factors is to compare the defendant to a similarly situated person. Instead, we instruct courts applying the doctrine of chances to carefully define the rare occurrence, assiduously evaluate whether the foundational factors have been satisfied, conduct a rule 403 analysis that focuses on the unique unfair prejudice that can flow from the admission of prior-acts evidence, and explain their reasoning in a transparent manner.

¶96   Because the State failed to establish the relevant baseline frequency, the district court erred when it admitted the other-acts

evidence under the doctrine of chances. And the court of appeals erred when it affirmed the district court's decision.

## II. WE REVERSE THE COURT OF APPEALS' DECISION TO UPHOLD THE DISTRICT COURT'S CONCLUSION THAT RULE 403 DOES NOT REQUIRE THE EXCLUSION OF THE OTHER-ACTS EVIDENCE

¶97 Richins also asks us to reverse the court of appeals holding that the other-acts evidence did not run afoul of rule 403 of the Utah Rules of Evidence. *See State v. Richins*, 2020 UT App 27, ¶ 31, 460 P.3d 593. Richins argues the court of appeals erred in four ways when it held that the district court had properly applied rule 403.[12] Richins needs to convince us that one of those arguments is correct to prevail. We agree with Richins that the court of appeals should not have affirmed the district court's holding that rule 403 did not require exclusion of the other-acts evidence.[13] The district court abused its discretion in admitting that evidence because the risk of unfair prejudice emanating from its admission substantially outweighed its probative value.

¶98 We have always envisioned that rule 403 would play a crucial role in the doctrine of chances analysis. In *State v. Verde*, we said that the "four foundational requirements . . . should be considered within the context of a rule 403 balancing analysis." 2012

---

[12] Richins first argues that "the similarity between the other-acts and the charged conduct increased the other-acts' risk for unfair prejudice," rather than reducing its risk of unfair prejudice, as the court of appeals concluded. Richins next argues that the court of appeals failed to balance the other-acts evidence's probative value against its improper propensity tendency as part of its 403 analysis. Richins then contends that admitting the other-acts evidence via stipulation did little to actually limit the impermissible propensity inference based on the evidence. He last argues that the other-acts evidence—even if admissible under the doctrine of chances—should have been excluded as impermissible statistical evidence that Daughter was telling the truth under rule 403.

[13] Utah Rule of Evidence 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

UT 60, ¶ 57, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, ¶ 57, 391 P.3d 1016. We held that "even if 404(b) evidence appears to have a dual purpose—to be aimed at both proper and improper inferences—it may nonetheless be excluded under rule 403 if" it runs afoul of that rule's balancing test. *Id.* ¶ 17. We also explained that "[f]idelity to the integrity of the rule requires a careful evaluation of the true—and predominant—purpose of any evidence" offered under the doctrine of chances. *Id.* ¶ 22. We explained that "if the evidence may sustain both proper and improper inferences under rule 404(b), the court should balance the two against each other under rule 403." *Id.* ¶ 18. This evidence should be excluded if "any permissible purpose is outweighed by its propensity for an improper inference or for jury confusion about its real purpose." *Id.* ¶ 22. We emphasized that this "weighing is essential to preserve the integrity of rule 404(b)" because without it, "evidence of past misconduct could routinely be allowed to sustain an inference of action in conformity with bad character—so long as the proponent of the evidence could proffer a plausible companion inference that does not contravene the rule." *Id.* ¶ 18.

¶99   In *Thornton*, we reaffirmed the importance of rule 403 when a court considers prior-acts evidence. We said that the "court's job under rule 404(b) is not to balance or weigh competing (proper and improper) inferences." *Thornton*, 2017 UT 9, ¶ 59. Rather, that "weighing comes in under rule 403." *Id.* And we repeated our holding in *Verde* that "if 404(b) evidence appears to have a dual purpose—to be aimed at both proper and improper inferences—it may nonetheless be excluded under rule 403." *Id.* (quoting *Verde*, 2012 UT 60, ¶ 17).[14]

¶100  In this case, the court of appeals noted the limitations of the district court's rule 403 analysis. The court of appeals wished that the district court had been "more thorough," but it nevertheless held that the district court's analysis was sufficient. *Richins*, 2020 UT App 27, ¶ 31. We agree that the district court should have been "more thorough." We reemphasize here that a district court must examine the specific probative value of the evidence being weighed under

---

[14] We take this opportunity to amplify what we said in *Thornton*. If our jurisprudence is to embrace the use of the doctrine of chances, courts will need to perform a rule 403 inquiry that includes a weighing of the permissible and impermissible inferences the jury could take from prior acts evidence.

rule 403 and also of all of its potential prejudicial effects. And that a district court must give attention to the unfair prejudice that can flow from a jury placing its faith in the impermissible inference. In other words, when considering a rule 403 challenge to doctrine-of-chances evidence, a district court must weigh the probative value of the proper inference against the risk that the jury will draw the impermissible evidence. The district court did not do that here.

¶101  But the court of appeals was willing to overlook the failings in the district court's order. And the court of appeals gave three reasons why it believed the district court had correctly balanced the other-acts evidence's probative value against the dangers rule 403 identifies. *See id.* The court of appeals first held that the evidence was admitted for a probative purpose: rebutting Richins's fabrication defense. *Id.* The court of appeals next reasoned that the stipulation that admitted the evidence "greatly sanitized" the other-acts evidence by removing inflammatory facts and eliminating "live victim testimony." *Id.* Finally, the court of appeals concluded that the risk of unfair prejudice was reduced because the district court instructed the jury that the evidence should not be used "to prove a character trait of the defendant." *Id.*

¶102 We agree with the court of appeals insofar as we agree it was important for the district court to have examined the purpose of the evidence's admission and to have taken steps to mitigate potential unfair prejudice. But those measures cannot compensate for the district court's failure to conduct the type of balancing that we described in *Thornton.*

¶103 *Thornton* instructs the district court to "balance or weigh competing (proper and improper) inferences. . . . under rule 403." 2017 UT 9, ¶ 59. The district court needed to identify the likely inferences the jury would draw from the other-acts evidence and then ask if the evidence's probative value (the jury drawing a permissible inference) was substantially outweighed by the danger of unfair prejudice (the jury drawing an impermissible inference). If the district court were to conclude that the jury is substantially more likely to rely on an impermissible inference, the evidence must be excluded under rule 403. The district court did not engage in that analysis here, and it abused its discretion as a result. The court of

appeals then erred by upholding the district court's admission of the other-acts evidence without that analysis.[15]

¶104 Had the district court employed this balancing, it should have concluded that the evidence's probative value was substantially outweighed by the danger of unfair prejudice. This is because the district court identified the purpose for admitting the evidence as determining "what [Daughter] saw." Under that articulation, there is little separating the impermissible inference from the permissible one. Although the purpose may be couched in terms of probability, the district court admitted the evidence to permit the jury to infer that Daughter saw what she said she saw because Richins was accused of doing the same thing before. The risk of the jury making a character-based inference substantially outweighs the probative value of the other-acts evidence under these circumstances.

¶105 The result does not change if we give the district court's ruling the more generous gloss that the court of appeals did. They analyze the question as if the district court really meant that the other-acts evidence was admitted to rebut a claim of fabrication. *Richins*, 2020 UT App 27, ¶ 21. Under that articulation, there is a little, but only a little, more room between the permissible and impermissible inference. The non-propensity-based inference is that because Richins had been accused of similar behavior on four prior occasions, it is unlikely that Daughter fabricated a story that closely matched the other accusations. The impermissible inference is the same as before—because Richins did this type of thing before, he did it this time. But even in this posture, the risk of the jury resorting to the impermissible inference overwhelms the possibility that the jury will confine itself to focusing on the probability of fabrication. Stated differently, we have no confidence that, having told the jury that

---

[15] This is not to suggest that the rule 403 balancing we described in *Verde* and *Thornton* displaces the other balancing that a district court must do under rule 403. Notions of unfair prejudice and issue confusion, as well as conventional assessments of probative value, are still fair game in the doctrine of chances context. But a district court will necessarily err if it fails to balance the permissible and impermissible inferences because a district court abuses its discretion when it misapplies the law. *See State v. Barrett*, 2005 UT 88, ¶ 16, 127 P.3d 682 ("[T]rial courts do not have discretion to misapply the law." (alteration in original) (citation omitted)).

Richins engaged in this behavior previously, the jury would do anything other than indulge the inference rule 404(b) exists to prevent.

¶106 Although the district court erred by failing to exclude the evidence, we applaud two steps that the State and the district court took to mitigate the prejudice that would flow from the evidence's admission. First, the State agreed to admit the evidence in through a stipulation that, to a large degree, sanitized the other-acts evidence by removing salacious and extraneous details. Second, the district court instructed the jury on the proper use of the other-acts evidence. In a different case, steps like these might have had a material impact on the rule 403 balancing. Here, however, the danger of the jury drawing the impermissible inference so substantially outweighed the evidence's probative value that the stipulation and jury instruction could not have a curative effect. But we commend the district court for its decision to permit the stipulation and to instruct the jury about the proper use of prior acts evidence. We encourage other courts to do the same.

### III. ADMISSION OF THE OTHER-ACTS EVIDENCE PREJUDICED RICHINS

¶107 Richins argues that he should receive a new trial because admission of the other-acts evidence prejudiced him. "[A]n [evidentiary] error requires reversal only if there is 'a reasonable likelihood of a more favorable result' for the accused had the error not occurred." *State v. Lopez*, 2018 UT 5, ¶ 30, 417 P.3d 116 (alteration in original) (citation omitted). "A reasonable likelihood of a more favorable outcome exists if our confidence in the result of the trial is eroded." *Id.* (citation omitted).

¶108 Richins argues that, absent the other-acts evidence, the jury would have only heard the "uncertain" testimony of Neighbor and Daughter. Daughter testified that "[i]t kind of looked like [Richins] might have been masturbating." Daughter also said it was "possible" that Richins wasn't masturbating at all—that he had his "hands in his pockets."

¶109 Neighbor's testimony was similarly equivocal. She said that he "may have just had his hands clasped in front of him. That's all I saw." *See also supra* ¶¶ 4-7.

¶110 The State defends the strength of this testimony, opining that it was not "uncertain." And, indeed, there are moments when Daughter testified more definitively. The State points to Daughter's testimony that it "certainly looked like [Richins] was holding

something down near his pockets." She also testified that Richins was "clearly holding something." And she said that his hands were moving "in a back and forward motion." But all this means is that the jury heard Daughter testify with varying degrees of certainty about what she saw. It does not negate the times the jury heard Daughter hedge.

¶111 We also know that during deliberations, the jury sent a note asking what they should do if they could not reach a verdict. *See supra* ¶ 31. This strongly suggests that, for a time, at least one juror entertained doubts of Richins's guilt.

¶112 The jury sent this note even after the State had made the doctrine of chances a central talking point. The prosecutor began his opening statement by talking about "coincidences," saying that there was a coincidence in the case with both his last name and birthday— but said that those two facts mean "nothing," as they were "just coincidences" or "[r]andom facts" or "[r]andom occurrences." *See supra* ¶ 26. He then claimed there would be "some data in this trial, some probabilities and some things like that, that actually will be firm and strong and sound enough that you can make conclusions based on that data." *See supra* ¶ 27. He previewed both Daughter's testimony and the other-acts evidence. *See supra* ¶ 28. He concluded his opening statement by directly linking Daughter's testimony and the other-acts evidence as the two key components of his case, saying "because of this [other-acts] evidence and the evidence of [Daughter], we'll be asking you to return a guilty verdict." *See supra* ¶ 28.

¶113 In closing argument, the prosecutor asked, "So how is it when you apply that to these four separate allegations, right, and then [Daughter's] description of the exact same conduct essentially, what are the odds of such a misfortune befalling Mr. Richins on five separate occasions?" *See supra* ¶ 29. Without the admission of the other-acts evidence, the prosecutor would have had no basis for these arguments. And the prosecutor would have been stuck with Daughter's decidedly less-than-decisive testimony.

¶114 It is therefore not difficult for us to conclude that removing the evidence of the four other times Richins was accused of similar behavior would have impacted the jury such that "our confidence in the result of the trial is eroded." *Lopez*, 2018 UT 5, ¶ 30 (citation omitted). We reverse the court of appeals and hold that, if the jury had not heard the other-acts evidence, Richins stood a reasonable likelihood of a more favorable outcome. Richins is entitled to a new trial.

**CONCLUSION**

¶115 The court of appeals erred when it upheld the district court's decision to admit evidence of Richins's prior bad acts. The district court exceeded the bounds of its discretion because the State did not lay a proper foundation for the admission of the evidence under the doctrine of chances. Specifically, the State did not introduce evidence that would permit the district court to conclude that Richins had been accused of improper behavior more frequently than a typical person. In addition, the district court abused its discretion when it concluded that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. The district court did not, as it is required to do, weigh the probative value of the permissible inference the State asked the jury to indulge against the danger that the jury would rely on the evidence to draw the impermissible inference. The court's errors prejudiced Richins and he is entitled to a new trial. We reverse and remand.

————————